**Michelle R. RIO, Plaintiff,**

v.

**Marvin T. RUNYON, Postmaster General of the U.S. Postal Service, Defendant.**

No. 94–7078–CIV–ZLOCH.

United States District Court,
S.D. Florida.

June 16, 1997.

Susan Dolin, Daniel Levine, Muchnick, Wasserman & Dolin, Hollwood, FL, for plaintiff.

Jeffrey Levenson, Asst. U.S. Atty., Fort Lauderdale, FL, Janelle Sherlock, U.S. Postal Service, Law Dept., Atlanta, GA, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SELTZER, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff, Michelle R. Rio, brings this action against Defendant, Marvin T. Runyon, in his official capacity as Postmaster General of the United States Postal Service. Plaintiff alleges disability discrimination under the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 and 794a, and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16(c). Plaintiff seeks declaratory, injunctive, and equitable relief, as well as compensatory damages, punitive damages, costs, and attorneys fees. Jurisdiction is founded on 29 U.S.C. §§ 791, 794, and 794(a), 42 U.S.C. § 2000e–5(f)(3), and 42 U.S.C. § 1981a. For the reasons set forth below, this Court does not find that Plaintiff has sustained her burden of persuasion and, accordingly, will enter judgment for Defendant.

## II. FINDINGS OF FACT

### A) Background

On or about August 31, 1981, Plaintiff became employed by the United States Postal Service; she was assigned to the Fort Lauderdale Main Post Office as a letter carrier. Plaintiff performed the full duties of that position for approximately six years. In or about 1987, claiming that she was no longer able to perform outdoor duties (delivering the mail), Plaintiff requested and was granted temporary light duty assignments. Thereafter, she renewed them on a monthly basis. In 1989, Plaintiff transferred to the North Andrews Annex ("N.A.A."), where she became a "router" within the carrier craft, an indoor assignment requiring only that she sort ("case") the mail before delivery.

In March 1994, the Postal Service, in accordance with an agreement with the National Association of Letter Carriers, abolished all router positions at N.A.A. In response,

Plaintiff decided to bid on and was awarded a mail delivery route. From March 7 to April 15, 1994, she both cased and delivered mail on route 932.[1] On April 15, 1994, she was placed in an off-duty status and, thereafter, scheduled for a psychiatric fitness for duty examination. Following the examination, Plaintiff was cleared to return to duty. She returned on June 17, 1994, but again requested and was granted light duty status, performing indoor work only. Plaintiff remained assigned to route 932 in a light duty capacity for several months thereafter.

On or about November 9, 1994, Plaintiff filed the instant lawsuit. Defendant was served on or about November 21, 1994.

On January 20, 1995, following a critical inspection of route 932 by the Fort Lauderdale Postmaster, Defendant reduced Plaintiff's hours to four per day; on January 27, 1995, Defendant denied Plaintiffs light duty assignment entirely. Defendant has not recalled Plaintiff to work since that date.

### B) Contentions

Plaintiff claims to suffer from three disabling mental illnesses: agoraphobia; clinical depression; and anorexia nervosa. Plaintiff attributes her agoraphobia to an assault she suffered at an outdoor concert at age fourteen or fifteen; it reportedly causes heart palpitations, hyperventilation, dizziness, weakness, and feelings of fright or terror. Plaintiff describes her agoraphobia as a fear of open spaces, which prevents her from attending events at parks or stadiums, having close bodily contact, shopping at a mall or busy grocery store alone, and driving in unfamiliar places. More pertinently, Plaintiff contends that her agoraphobia prevents her from performing the outdoor functions of her job—delivering the mail.[2] Plaintiff acknowledges that she completed high school, joined the Air Force, and delivered mail for the Postal Service from 1981 to 1987, notwithstanding her alleged condition. She currently visits the library and attends lectures,

---

**1.** Because Plaintiff's treating psychiatrist would allow her to deliver only the business portion of her route, the Postal Service permitted her to hand-off the residential portion to other carriers.

**2.** In a fitness for duty examination, however, Plaintiff revealed that she did not have problems delivering mail but that her psychiatrist restricted her from that kind of work because of the added job stress.

concerts, and auctions. And, although her treating psychiatrist has prohibited her from driving a Postal Service vehicle while at work, nothing in the record suggests that Plaintiff has been unable to drive her own vehicle to and from her jobs since 1981.

With reference to her alleged clinical depression, Plaintiff testified that she first experienced symptoms of this illness when her grandmother passed away in 1980.[3] At the time, she was in the Air Force and was hospitalized for approximately two months; thereafter, she was discharged from her military service. Plaintiff claims the symptoms of her depression resurfaced shortly after becoming employed by the Postal Service when a supervisor made sexual suggestions to her. In February 1987, she again experienced depression following an alleged threat by another supervisor, Ken Sorrells. Not until Joanne Fleszar came to N.A.A. as her supervisor in March 1992 did Plaintiff again suffer the symptoms of depression. According to Plaintiff, her depression makes it difficult to get out of bed, prompts her to cry and walk around aimlessly, and leaves her feeling hopeless and helpless with low self-esteem and no hope of improvement.

Plaintiff describes her anorexia nervosa as an "off-shoot" of her depression; it causes her to fear gaining weight and to stop eating. She testified that her symptoms of anorexia nervosa first arose following the Ken Sorrell's threats in 1987.[4] Plaintiff testified that her condition thereafter improved, only to deteriorate again after Joanne Fleszar arrived at N.A.A. in March 1992.

Plaintiff attributes the exacerbation of her mental illnesses to the harassment by her supervisor, Joanne Fleszar. Plaintiff accused Fleszar of sending her for a June 1992 psychiatric fitness for duty examination to upset her or to try to fire her. However, the record reflects that a human resources manager (not Ms. Fleszar) requested the examination because Plaintiff had indicated she (Plaintiff) might harm herself. In addition, Plaintiff claims Fleszar set impossible casing standards for her to meet. Fleszar countered that Plaintiff failed to meet Postal Service performance standards, a matter she often discussed with Plaintiff. Flezsar explained that the Postal Service expects carriers to meet a casing standard of four feet per hour; and it expects routers to case even larger volumes—five to five and a half feet per hour—because they are generally casing thicker mail and not performing a carrier's other office duties. Plaintiff's own router slips corroborate Fleszar's impressions. They reflect that Plaintiff's average casing speed as a router from January to March 1994 was 3.78 feet per hour. On 28 of 64 slips, she cased fewer than 3.5 feet per hour; and on 16 of 64 entries, she cased fewer than 3 feet per hour.

Plaintiff also complained that Fleszar sent her home when there remained available work. Although Fleszar acknowledged that when Plaintiff was a router she sent her home periodically, she explained that she did so when the mail volume was sufficiently low that it could be cased the next day by carriers who were guaranteed eight hours of work under the collective bargaining agreement.[5] Carmel Bennett, a former N.A.A. station manager, testified that the Postal Service expects its supervisors to select the most cost efficient means to process the mail.

Plaintiff also testified that although Fleszar spoke politely to everyone else, she made demeaning, disparaging, and humiliating remarks to her in front of co-workers; and on other occasions, she spoke to her as a child.[6] Fleszar adamantly denied speaking rudely to Plaintiff. Indeed, several carriers had complained to Fleszar that management had been too lenient with Plaintiff, whom many carriers believed was not pulling her weight.

---

3. Plaintiff told Dr. Magid that she had been very depressed as a child, and she told Dr. Weiner (her treating psychiatrist) that she had suffered depression as long as she could remember.

4. Plaintiff told Dr. Weiner that she became anorexic in 1985 after being deceived by an individual she had been dating; as a result, she sought to "outdo" the other woman. Similarly, she told Dr. Casademont that she began to diet rigorously after her boyfriend started dating a thinner woman.

5. As a light duty employee, Plaintiff was not guaranteed eight hours of work per day.

6. Plaintiff told Dr. Casademont that she realized that Fleszar had problems with almost everybody.

Fleszar related that throughout the period she supervised Plaintiff, she (Fleszar) felt she not only was more lenient with Plaintiff than with other employees, but also "had to walk on eggshells," never knowing what Plaintiff's mood might be each day. The carriers also told Fleszar that they were tired of Plaintiff's outbursts on the workroom floor. Fleszar did acknowledge telling Plaintiff that she was the source of her own problems and that other carriers were tired of her complaining about her problems; Fleszar apologized to Plaintiff for this remark the following day. Fleszar further testified that when she counseled Plaintiff about her work performance or instructed her to go home early, Plaintiff would occasionally hyperventilate. Fleszar recounted that on one occasion when she directed Plaintiff to leave early, Plaintiff became hysterical and huddled in a ball on the floor.

Carmel Bennett testified that after Plaintiff complained to her about feeling intimidated by Fleszar, Bennett suggested to Fleszar that she attempt a softer approach to Plaintiff. According to Bennett, this softer approach only generated further allegations by Plaintiff, who then complained that Fleszar either was speaking to her too quietly or not at all. Bennett stated that regardless of how management treated Plaintiff, she consistently claimed that something was wrong.

Plaintiff testified that in March 1994, she received official notice that the router positions would be abolished. She discussed with Carmel Bennett, Joanne Fleszar, and others the possibility of her bidding on a route that she would deliver herself. Plaintiff testified that she elected to bid on a letter carrier route, rather than seek assignment to the clerk craft or to another indoor position, because she did not want to lose seniority and other benefits under the collective bargaining agreement. Bennett stated that she assured Plaintiff she would assist her in gradually returning to street duties. She also reminded Plaintiff that her medical re-

strictions would first have to be changed because her psychiatrist had limited her to indoor work.[7] Indeed, after Plaintiff was awarded route 932, and in response to Plaintiff's request, her treating psychiatrist—Dr. Weiner—modified her seven year restriction to indoor duty, permitting her to deliver mail; but he limited her to office building deliveries only. The Postal Service attempted to accommodate this restriction by permitting her to hand-off the residential section of her route to another carrier each day. Notwithstanding this accommodation, Plaintiff continued to allege harassment, specifically with respect to Fleszar's criticism of her performance. The work records, however, belie Plaintiff's suggestion that such criticism was unwarranted.

The records reveal that on March 7, 1994, Plaintiff's first day on route 932, she spent approximately 11.5 hours just in the office, casing only 16.25 feet of mail—far below the 4 feet per hour standard. When Plaintiff did go out onto the street, she worked only 33 minutes; the Postal Service provided street assistance from another carrier. Indeed, during the 6 week period that Plaintiff delivered route 932, her average casing speed was only 2.88 feet per hour. Although Plaintiff's average mail volume was only 21.63 feet, her average office time during this period was 7.52 hours. On almost all days that Plaintiff delivered route 932, her total street time, *including assistance,* substantially exceeded the 3.97 hours that had been determined as the reference street time for that route. And even though Plaintiff handed off the entire residential section of her route every day, and even received frequent assistance casing the mail and delivering the business portion of the route, Plaintiff never returned to N.A.A. before 5:30 p.m.

Plaintiff contends that Fleszar also found other ways to harass her during this time frame. Plaintiff complained, for instance,

7. Pursuant to the provisions of the applicable national collective bargaining agreement, Plaintiff was given written notice that she was required to submit medical documentation indicating that she would be able to fully perform the duties of her bid assignment six months after receiving such assignment, or lose her bid assignment. If Plaintiff was unable to fully perform her duties in six months, she would be eligible for another six-month extension. If unable to fully perform her duties one year after receiving her bid assignment, she would lose her bid assignment under the collective bargaining agreement, which would have been in March 1995.

that Fleszar moved her starting time from 6:00 to 6:30 a.m. Fleszar, however, explained that she adjusted the starting time for all carriers, not just for Plaintiff. Plaintiff also alleged that Fleszar physically attacked her by throwing a key ring at her, striking the side of Plaintiff's case. Fleszar denied Plaintiff's allegation, and her denial was corroborated by others who witnessed the incident. They testified that Fleszar had merely tossed her keys onto her desk and that the keys then slid off the desk.

Plaintiff also testified to harassment from supervisors other than Fleszar. She contends that in April 1994 she was singled out for an office check on route 932. Plaintiff saw this as a disciplinary measure. She became further upset when informed that Angel Cruz, an individual whom she believed to be violent, was to conduct the check. Plaintiff also accused Station Manager Bennett of threatening that the day of the office check might be Plaintiff's last. Plaintiff reported that upon learning the details of the office check, she suffered an agoraphobic attack, hyperventilated, and fell to the floor. She claims that as she fell she "badly cut her arm on the case," requiring medical attention.

Bennett denied telling Plaintiff that the day of her office check might be her last. Bennett stated that she did overhear Plaintiff getting loud and upset after being notified of the office check. Plaintiff was complaining that the office check amounted to harassment and that the supervisors were trying to fire her. Bennett testified that she explained to Plaintiff that she (Bennett) had requested the office and street checks because she needed to assess the new route adjustments. Fleszar confirmed that Plaintiff began hyperventilating when informed of the office check. Fleszar brought a bag for Plaintiff to breathe in and then went next door to a pharmacy to purchase alcohol wipes to clean a small scratch on Plaintiff's arm.[8]

Plaintiff testified that on the morning of her office check Angel Cruz yelled at her loudly and stated, "I'll get you on the street another day." Plaintiff interpreted this not as a statement that he would check her delivery times another day, but as a threat to attack her on the street.

A couple of days later, Plaintiff returned to the medical office for a follow-up examination on her arm. Because of her behavior in his office—Plaintiff admitted she was upset, shocked, and crying—Dr. Malcolm Schwartz recommended to the Postal Service that Plaintiff be cleared by her cardiologist and therapist before returning to work. Plaintiff testified that when she returned to the Post Office following this examination, Carmel Bennett informed her she would be sent for a psychiatric fitness for duty examination and would be placed in an off-duty status until the examination had been completed. Bennett confirmed that she so notified Plaintiff. She explained that she had called Dr. Schwartz concerning his recommendation and learned that Plaintiff's behavior in the medical office had been inappropriate and dysfunctional, raising a concern that she might be a threat to herself.

As Plaintiff began to leave the Post Office, she fainted. Paramedics were called to attend to her; she was discharged from the hospital later that afternoon. Plaintiff stated that she then went to two different churches for her Last Rites. That evening, however, she returned home and began taking the anti-depressant Prozac, which medication she has been taking ever since.

On May 17, 1994, Plaintiff saw Dr. Pascual for a psychiatric fitness for duty examination. In his report, Dr. Pascual opined: "She does not seem significantly depressed to warrant a diagnosis of major depression … it seems more likely that most of the difficulties she has encountered at work are related to her personality structure, as she has demonstrated obsessive/compulsive, passive/aggressive, and avoidant traits." He further wrote: "[I]n interpersonal relationships, she is often passive, manipulates indirectly but effectively, and behaves in dramatic ways to gain attention." Dr. Pascual found that Plaintiff was not a danger to herself or others and cleared her to return to duty.

---

8. The records of Plaintiff's medical examination confirm that the wound for which Plaintiff sought treatment was "merely a dry scratch."

On June 17, 1994, Plaintiff returned to work, but her treating psychiatrist, Dr. Weiner, again limited her to indoor activities. The Postal Service permitted Plaintiff to return to temporary light duty, only casing the mail, while other carriers delivered her route. But Plaintiff maintains that the supervisors' harassment persisted. Defendant denies the allegation.

Plaintiff offered the testimony of Susan Robinson, Terri Cecere, Andy Jenkins, Charlie Trapp, and Brett Israel. All testified to unfair or offensive treatment of Plaintiff by Postal Service supervisors and employees. The Court, however, does not fully credit their testimony. The Government substantially impeached the testimony of these individuals. All were either close friends of Plaintiff, had testified to material matters at trial that were inconsistent with their deposition testimony, or had been disciplined by or had an otherwise adversarial relationship with Defendant. Nonetheless, the Court does find from their testimony that some Postal Service personnel occasionally made offensive comments concerning Plaintiff's emotional disposition—often behind her back—and that others were at times blunt in expressing their disapproval of her behavior and performance.

The Postal Service elicited the testimony of carriers Lewis Palmisiano and Rick Elia. Plaintiff did not impeach these carriers, and the Court accepts and credits their testimony. These carriers worked mail cases close to that of Plaintiff and were therefore in a position to observe her performance, as well as her interaction with supervisors and co-workers. Palmisiano testified that Fleszar's management style was more "by the book" than that of other supervisors, although he never heard Fleszar or any other supervisor yell at Plaintiff or call her names. He did hear Plaintiff occasionally raise her voice, and he observed her walking up and down the aisles asking other carriers if they had seen what a certain supervisor had allegedly said or done to her. Palmisiano testified that he often stayed clear of Plaintiff because of her variable moods, and he went out of his way to avoid confrontation. Rick Elia testified that Plaintiff cased her route slower than other carriers who worked that same route. Elia also never heard supervisors scream at Plaintiff or call her names. Elia described Angel Cruz as a "business type supervisor," who had a direct manner in addressing employees.

Lettie Carroll replaced Joanne Fleszar as Plaintiff's supervisor in November 1994. Carroll testified that when she arrived at N.A.A., she had very little experience supervising a zone of carriers. She noted that many carriers took advantage of her inexperience by requesting assistance and overtime they did not need. To remedy this abuse, Carroll gave a service talk to all the carriers, telling them she expected eight hours work for eight hours pay. Following this service talk, Plaintiff approached Carroll and expressed concern that the service talk had been directed at her personally.

On January 20, 1995, Station Manager James Plather notified Plaintiff that her hours would be reduced to four per day. And on January 27, 1995, Plather informed her that she would no longer be permitted to work at N.A.A. but that she should notify him if her light duty restrictions changed. Plaintiff contends that Plather's January 1995 actions were in retaliation for her having filed the instant lawsuit in November 1994.

Fort Lauderdale Postmaster Pete Stokes made the January 1995 decision to deny Plaintiff her light duty. Stokes testified that after receiving complaints from customers concerning the non-delivery and late delivery of mail on route 932, he sought to determine the cause of the problem. On or about January 20, 1995, he went to N.A.A. He arrived at approximately 2:00 or 2:15 p.m. and found that route 932 was still in the office; it had not yet been taken out for delivery. Stokes asked Station Manager Plather what the reason was for the delay on route 932. Plather told him that the assigned carrier (Plaintiff) had just finished casing the route after eight hours and had gone home. Stokes asked the identity of the carrier and, upon learning that the carrier (Plaintiff) was on temporary light duty, directed Plather to cancel her light duty. A few days later, Stokes learned that Plather had still not cancelled Plaintiff's light duty. He asked Plather when he was

going to do so; Plather replied that he would do so that day.

Stokes further testified that he oversees approximately 1200 clerks and 500 carriers and, therefore, had no knowledge in November 1995 of Plaintiff's suit; and, further, he had no knowledge of Plaintiff's suit in January 1995 when he elected to cancel her light duty. Although Stokes acknowledged receiving a June 1994 letter from Plaintiff's counsel concerning Plaintiff's emergency suspension and fitness for duty examination, he testified that he merely forwarded that letter to "the legal people" for interpretation. Station Manager Plather similarly testified that in January 1995 he had no knowledge of Plaintiff's November 1994 suit. Plather first learned of the suit when he was contacted by the Postal Service's legal department to assist in responding to Plaintiff's discovery demands.

Stokes' distress over Plaintiff's performance finds support in the statistical evidence. Plaintiff's router slips reflect that from June 1994 (Plaintiff's return from emergency suspension) until January 1995 (the cancellation of her light duty), during which period Plaintiff was casing but not delivering route 932, her average casing speed was only 2.88 feet per hour. This not only was below the 4 feet per hour standard for carriers, but was even further below the 5 to 5½ feet per hour standard for routers. Her average cased volume in this period was only 24.63 feet, although she generally worked 8.54 hours per day regardless of mail volume. For example, Plaintiff cased 18.25 feet in 8 hours on July 16, 1994, and 14.75 feet in 8 hours on August 30, 1994; yet, she managed to case 32 feet in 8.08 hours on September 9, 1994, and 30 feet in 8.01 hours on November 2, 1994. The records document only three occasions on which Plaintiff cased more than four feet per hour. And on most days, she did not complete casing the route until between 2:00 and 2:30 p.m.

Stokes' cancellation of Plaintiff's light duty finds vindication in the testimony of the carriers, Karee Adams and Derrick Olan, who cased and delivered route 932 following Plaintiff's January 1995 departure. While acknowledging that route 932 was one of the heavier volume routes, Adams stated that she was able to complete casing the route and leave for the street before noon on all but the heaviest days. Further, she normally delivered the entire route without handing-off the residential section. The latest that Adams delivered route 932 was 4:00 or 4:30 p.m. Derrick Olan, the other carrier, testified that after casing route 932, he generally left for the street by 11:00 a.m. He delivered the entire route himself and was usually back at N.A.A. by 4:30 or 5:00 p.m.

On August 4, 1995, Dr. James Jordan examined Plaintiff as part of his independent psychiatric evaluation. Dr. Jordan's credentials are impressive: board certified in psychiatry and neurology; former chief of psychiatry at several prominent hospitals; former faculty member at various medical schools; past President of the Broward County Psychiatric Society and the Florida Psychiatric Society; and gubernatorial appointee to the State of Florida Board of Medicine and to the State of Florida Commission on Mental Competency of Death Row Inmates. Before examining Plaintiff, Dr. Jordan reviewed her medical records from Humana Hospital Biscayne and her psychiatric records from Dr. Gary Magid, Dr. James Weiner (Plaintiff's treating psychiatrist), Dr. A. Carlos Casademont, and Dr. Bernard Pascual. Dr. Jordan also reviewed the pertinent pleadings and discovery materials. Following his examination of Plaintiff, he wrote:

> After having evaluated Ms. Rio and having reviewed these medical records, it is my professional opinion that Ms. Rio is not suffering from any disabling mental condition. Ms. Rio herself states that she feels no impairment in her ability to function in her role as a postal service worker.

> However, she leaves the reasons for her not working open to her own interpretation of what might take place on the job. She states that if she feels that comments are being made about her personally, this could be upsetting enough to her so as to prevent her from being able to continue to work. This is not a condition that is present as a result of a mental disorder. It is as though she wants to place herself in the position of judging whether co-workers' comments are of such a nature that she would consider herself to be disabled in response to such remarks.

My evaluation did not find evidence of significant anxiety or any depression in this woman. Two previous psychiatric evaluations have not found evidence of any significant mental disorder in Ms. Rio. Only Dr. Wiener has felt that Ms. Rio has been disabled from working because of some type of mental disorder. Two different MMPI reports have not found evidence of significant mental disorder. Personality characteristics have been raised as being part of Ms. Rio's problem in adjustment at work. Personality patterns are not mental disorders that are considered disabling in this work situation. There is no evidence of psychosis, obsessive-compulsive disorder, or any type of severe mental illness in this woman.

There was the claim that she was unable to work outside the office because of agoraphobia, which she had related back to her mugging at Bicentennial Park. However, subsequent to that mugging, Ms. Rio describes herself as being very actively involved in public speaking and winning awards at this.

There has been the issue of Ms. Rio's depression. However, in her own reporting of herself and her self-characteristics, she finds it very difficult to even think of a negative characteristic to present about herself. This is certainly not in keeping with someone who suffers with problems with depression.

\* \* \* \* \* \*

In summary, it is my opinion that Ms. Rio does not suffer from any major mental disorder. I do not feel that she is disabled because of any psychiatric or psychological disorder. I do not feel that she has any psychiatric or psychological impairment. I do not feel that Ms. Rio's reporting that hearsay comments from co-workers would be the cause of her being unable to continue to work.

The Court finds Dr. Jordan's credentials impressive, his reasoning sound, and his opinion persuasive, and, accordingly, fully credits his report and his testimony.

The Court has also heard and considered the testimony of Dr. James Weiner, Plain-

tiff's treating psychiatrist. Dr. Weiner also brings impressive credentials to this Court. Dr. Weiner first began a treating relationship with Plaintiff in 1987; he diagnosed her at that time with depression. Throughout the course of their professional relationship, Dr. Weiner relied in forming his judgment entirely upon his observations and upon Plaintiff's own reports, notwithstanding his personal belief that depressed individuals often hold distorted views of reality. Dr. Weiner sought no independent basis from which to gauge Plaintiff's credibility. He did not speak to any employee or supervisor at the Postal Service, did not review Plaintiff's other medical or psychiatric records, and did not conduct any objective testing. Based upon Plaintiff's report to him that indoor work would be less stressful, Dr. Weiner wrote a note to the Postal Service directing that his patient be limited to indoor work only; yet, nowhere in his records did he ever diagnose Plaintiff with agoraphobia. And when, after seven years of indoor work only, Plaintiff informed Dr. Weiner that her work restrictions would need to be revised, Dr. Weiner complied with her request; he amended his long-standing restriction to permit Plaintiff to deliver mail to office buildings. Then, after Plaintiff came under criticism for the slow pace of her work, he again amended his opinion, once more restricting her from any mail delivery. The Court finds this chronology suspect. Dr. Weiner apparently grounded his opinion and his restrictions largely upon Plaintiff's reports and requests. Furthermore, his opinion finding Plaintiff mentally disabled stands alone among the opinions rendered by the various psychiatrists that examined her. Accordingly, the Court declines to credit the testimony of Dr. Weiner.

### III. CONCLUSIONS OF LAW

#### A. Disability Discrimination

As a federal employee, Plaintiff's exclusive remedy for alleged disability discrimination in connection with her employment is the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791, 794, and 794a. *McGuinness v. United States Postal Service,* 744 F.2d 1318, 1322 (7th Cir.1984).[9] To establish a

---

9. Following the enactment of the Americans with Disabilities Act of 1990 ("ADA"), Sections 501

*prima facie* case of discrimination under the Rehabilitation Act, Plaintiff bears the burden of demonstrating (1) that she has a disability within the meaning of the statute and relevant regulations, (2) that she is a qualified individual, and (3) that she was discriminated against because of her disability. *Harris v. H & W Contracting Co.*, 102 F.3d 516, 519 (11th Cir.1996) (ADA). *See also* 42 U.S.C. § 12132.

An individual with a "disability" is one who has a physical or mental impairment that substantially limits one or more of such person's major life activities; alternatively, the individual must have a record of such impairment or be regarded as having such an impairment. 29 U.S.C. § 706(8)(B); 29 C.F.R. § 1614.203(a)(1). Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1614.203(a)(3).

A "qualified individual" is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the position in question. 29 C.F.R. § 1614.203(a)(6). The Plaintiff must make a *prima* facie showing that a reasonable accommodation is possible. *Shiring*, 90 F.3d at 831.

A qualified individual with a disability may establish unlawful discrimination by showing that she was not provided reasonable accommodation (unless the accommodation would have posed an undue hardship on the employer) and/or that she was subjected to an adverse personnel action because of her disability. *See, e,g., Jackson v. Veterans Admin.*, 22 F.3d 277 (11th Cir.1994). In addition, the law recognizes harassment as a form of discrimination under Title VII when that harassment creates a hostile work environment. *See, e.g., Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (sexual harassment). Although this Circuit has not yet recognized a hostile environment claim premised on disability,

various district courts have found hostile environment claims actionable under the ADA and the Rehabilitation Act. *See, e.g., McClain v. Southwest Steel Co., Inc.*, 940 F.Supp. 295, 301–02 (N.D.Okla.1996) (ADA); *Gray v. Ameritech Corp.*, 937 F.Supp. 762, 771 (N.D.Ill.1996) (ADA); *Fritz v. Mascotech Automotive Sys. Group, Inc.*, 914 F.Supp. 1481, 1492 (E.D.Mich.1996) (ADA); *Henry v. Guest Services, Inc.*, 902 F.Supp. 245, 251–52 (D.D.C.1995) (ADA); *Haysman v. Food Lion, Inc.*, 893 F.Supp. 1092 (S.D.Ga.1995) (ADA). For purposes of this action, therefore, the Court will assume that a disability-based hostile environment claim is actionable under the Rehabilitation Act.

■ Plaintiff has not satisfied her persuasion burden with respect to the first element of her discrimination claim. She has not established by a preponderance of the evidence that she is "disabled," as that term is defined in the governing statutes and regulations, with respect to any of her alleged psychiatric conditions—agoraphobia, depression, or anorexia nervosa. In arriving at this conclusion, the Court concurs with and adopts the conclusions of Dr. Jordan, who rejected Plaintiff's contrary contention. Although Plaintiff has experienced symptoms of agoraphobia, her impairment has not *substantially* limited her life activities. The Court notes the diverse range of activities in which Plaintiff has engaged since first experiencing agoraphobic symptoms following a teenage assault: award-winning public speaking; attendance at concerts and lectures; enlistment in the Air Force; and delivery of the mail. Moreover, Plaintiff's own statements to Dr. Jordan belie her contentions:

> He [Dr. Weiner] helped me through all those fears. He got me out there. I'm not limited in my personal life. I'm not housebound. It (the agoraphobia) only limits me in certain things such as football games or in a park where there is no coverage.

and 504 of the Rehabilitation Act were amended to provide that the governing standards in determining violations shall be those applied under Title I (the Employment Provisions) of the ADA. 29 U.S.C. §§ 791(g) and 794(d); *Shiring v. Runyon*, 90 F.3d 827, 831–32 (3rd Cir.1996). Accordingly, the Court must look to case law under

both the Rehabilitation Act and the ADA in considering the merits of Plaintiff's disability discrimination claims. *See Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 57 (4th Cir.1995) ("To the extent possible, we adjudicate ADA claims in a manner consistent with decisions interpreting the Rehabilitation Act.").

Plaintiff added that she was able to perform her job, including her street duties. The Court concludes that Plaintiff's indoor work restriction is attributable not to her agoraphobia, but to her desire to avoid the job pressures of being a letter carrier, who must both case and deliver a route.

Furthermore, even if Plaintiff's agoraphobia did render her incapable of delivering the mail, her inability to perform that one job (letter carrier) or even a narrow range of jobs (outdoor jobs) would not render her disabled. Under the Rehabilitation Act, an individual who suffers a substantial limitation of her ability to work at a specific job, is not disabled in the major life activity of working. *See, e.g., Maulding v. Sullivan*, 961 F.2d 694 (8th Cir.1992), *cert. denied*, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993) (alleged sensitivity to chemicals that prevented plaintiff from performing lab work but did not substantially limit employment as a whole did not constitute disability); *Forrisi v. Bowen*, 794 F.2d 931, 933 (4th Cir.1986) ("The inquiry is whether ... the particular impairment constitutes for the particular person a significant barrier to employment"); *Jasany v. United States Postal Serv.*, 755 F.2d 1244 (6th Cir.1985) (postal clerk with mild case of crossed eyes that caused him to develop eye strain and headaches after operating a particular machine was not substantially limited in working because he was capable of working at other jobs within the Post Office); *Mackie v. Runyon*, 804 F.Supp. 1508 (M.D.Fla.1992) (bi-polar disorder that plaintiff could stabilize with medication and that only prevented her from working at night did not substantially limit major life activities). Here Plaintiff retains the ability to work not only as a Postal Service clerk, but also at any other indoor job. Indeed, Plaintiff testified that she has worked at several indoor jobs since leaving the Postal Service in January 1995.

The Court also concludes that Plaintiff has not established that she is disabled due to major depression or to (what she characterizes as) an off-shoot of that depression, anorexia nervosa. Again, the Court credits the testimony of Dr. Jordan, who opined that

Plaintiff's diverse personal and work place activities, as well as her inability to find any negative terms to describe herself, are inconsistent with major depression. He also noted that individuals suffering major depression are not able to survive the long lapses between treatments reflected in Plaintiff's records. To the extent Plaintiff may have experienced intermittent episodes of depression since childhood, the Court finds that such symptoms have not substantially limited her major life activities.

The only workplace limitation that Plaintiff attributes to her depression is hypersensitivity to criticism. Although this is not disabling, the Court does find that Plaintiff personalized innocuous workplace events and chronically believed that her supervisors were out to "get" her. Plaintiff suggests that she would have been satisfied had her supervisors merely tempered their criticism with kindness and spoken to her in a gentler tone. The Court finds that such approaches were attempted but failed nonetheless. No matter how her supervisors approached her, Plaintiff complained of mistreatment. And Defendant's supervisors could not be expected to adopt a complete hands-off approach to Plaintiff merely because she misinterprets directives. The Court concurs with the observation of Dr. Pascual: Plaintiff's workplace problems are not attributable to major depression but to her personality structure. She "manipulates indirectly but effectively, and behaves in dramatic ways to gain attention." As Dr. Jordan pointed out, "Personality patterns are not mental disorders that are considered disabling in this work situation."

The Court also declines to find that Plaintiff is disabled on the basis of her anorexia nervosa, which reportedly grew out of an attempt to be thinner than another woman an ex-boyfriend was dating. Although Plaintiff periodically abused laxatives, the record also contains evidence that she underwent liposuction for the removal of excess body fat. As Dr. Jordan noted, one would not normally expect excess body fat deposits in an individual suffering severe anorexia. Dr. Jordan also noted Plaintiff's body weight, which was normal.[10]

---

**10.** Even if Plaintiff had established disabling anorexia, that condition was unrelated to her ability to perform the essential functions of her

■ Assuming, *arguendo,* that Plaintiff's mental condition is disabling, she fails nonetheless to satisfy the second element of her claim; she is not "a qualified individual" under the Rehabilitation Act.[11] To be deemed a qualified individual, an individual must be capable of performing the essential functions of the job in question, with or without reasonable accommodation. Plaintiff here testified that although she can perform most letter carrier duties (as set forth in the job description), she is unable to deliver the mail. Yet, Carmel Bennett, the former N.A.A. station manager, explained to the Court that mail delivery is "the function"—the most critical part—of the letter carrier's job. And even Plaintiff's counsel so acknowledged: "the essential functions of a letter carrier are to case and *carry* the mail." See Plaintiffs Proposed Findings of Fact and Conclusions of Law, p. 2, ¶ 4 (emphasis added). The Third Circuit Court of Appeals is of similar mind: "One of the essential functions of a mail carrier is to physically deliver the mail to the people along the route." *Shiring,* 90 F.3d at 831. This Court concurs that mail delivery is an essential function of the letter carrier position. By her own admission, therefore, Plaintiff is unable to perform an essential function of her job.

Finally, Plaintiff has not established that she was discriminated against because of her disability, the third element of her *prima facie* case. Plaintiff argues that she was not provided reasonable accommodation. Additionally, she claims that her April 1994 placement in off-duty status and order to undergo a fitness for duty examination was a discriminatory action based on her disability. Further, Plaintiff claims that she was subjected to a hostile work environment based upon her disability.

### 1. Reasonable Accommodation

Plaintiff alleges that Defendant failed to reasonably accommodate her disabilities at various points during her employment—both as a router and following abolition of the router position. Reasonable accommodation, however, never surfaced as an issue when Plaintiff was exclusively employed as a router (except for reasonable accommodation for Plaintiff's hypersensitivity to criticism, discussed *supra* ). The router position was an indoor job, requiring primarily that Plaintiff case the mail. She could perform the essential functions of that position without reasonable accommodation.[12]

■ With respect to Defendant's alleged failure to reasonably accommodate Plaintiff's disabilities [13] after the router positions were abolished, the Court finds that Plaintiff cannot establish her claim. The Court has concluded that mail delivery is an essential function of the letter carrier job. If Plaintiff is genuinely incapable of delivering the mail, no amount of accommodation on the part of the Postal Service—short of deleting that job function altogether—could make this possible. *Shiring,* 90 F.3d at 831. And the Rehabilitation Act does not require an employer to eliminate an essential function of a job as a reasonable accommodation. *See Jasany v. United States Postal Service,* 755 F.2d at 1250 ("post office was not required to accommodate [plaintiff] by eliminating one of the essential functions of [the] job"). Defendant, therefore, was not required to eliminate letter carrying as a reasonable accommodation to this letter carrier.

■ Although a federal employer need not eliminate an essential job function to accommodate a disabled employee, it must offer to reassign an employee who becomes unable to perform an essential job function to a funded, vacant position within the same commuting area and at the same grade or level. 29 C.F.R. § 1614.203(g); *Shiring,* 90 F.3d at 831–32. However, a Postal Service employee is not considered qualified for any offer of

job. Thus, she does not seek nor require reasonable accommodation of this disability

11. In determining whether Plaintiff is an otherwise qualified individual, the Court also considered whether reassignment is possible. *See Shiring,* 90 F.3d at 832. As discussed *infra,* Plaintiff failed to make a facial showing that such accommodation is possible.

12. Plaintiffs complaints regarding her treatment while she was a router are more appropriately analyzed as part of her hostile environment claim, *infra.*

13. Although this Court has declined to find either that Plaintiff was disabled or that she was a qualified individual, it will assume otherwise for purposes of analyzing her discrimination claim.

reassignment that is inconsistent with the terms of any applicable collective bargaining agreement. 29 C.F.R. § 1614.203(g). The law places the burden on the disabled Postal Service employee to demonstrate that there existed funded, vacant positions available under the collective bargaining agreement, the essential duties of which she was capable of performing, with or without reasonable accommodation. *Shiring*, 90 F.3d at 832.

Here Plaintiff has not established that she was a qualified individual with a disability entitled to the reasonable accommodation of reassignment. The record establishes that when the router positions were to be abolished in 1994, Carmel Bennett discussed with Plaintiff transferring her to the clerk craft, which duties were indoors and, therefore, within her limitations. Plaintiff rejected that option because of the losses she would have suffered under the collective bargaining agreement. She also rejected an October 1996 offer of reassignment to a mail processing position. Plaintiff cannot expect the Postal Service to violate an applicable collective bargaining agreement to reassign her as a reasonable accommodation. 29 C.F.R. § 1614.203(g). *See also Eckles v. Consol. Rail Corp.*, 94 F.3d 1041 (7th Cir.1996) (ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees); *Wooten v. Farmland Foods*, 58 F.3d 382 (8th Cir.1995) (finding that employer had no obligation to violate collective bargaining agreement in order to accommodate Plaintiff's need for light duty work, even if it perceived him to have a substantial impairment); *Milton v. Scrivner, Inc.*, 53 F.3d 1118 (10th Cir.1995) (holding that ADA did not require transfer of employees to other jobs given that collective bargaining agreement prohibited such transfer because employees lacked requisite seniority).

 Plaintiff contends that she is entitled to indefinite temporary light duty [14] after June 1994 as a reasonable accommodation under the Rehabilitation Act, notwithstanding that she cannot deliver the mail. This Court disagrees. Although the Postal Ser-

vice did permit Plaintiff only to case the mail on a temporary basis, that discretionary act does not require the Postal Service to maintain such a position as a reasonable accommodation. *See Shiring*, 90 F.3d at 831. The Postal Service is not required to create a position specifically for a disabled employee. *See id.* Accordingly, this Court declines to consider the nonexistent position of "caser" as an accommodation that would make Plaintiff qualified.

### 2. Adverse Actions Based on Disability

Plaintiff contends that her April 1994 placement in an off-duty status and mandated fitness for duty examination were discriminatory actions. The Court interprets this claim as one for disparate treatment based on disability. Courts apply the burden shifting rules from Title VII cases to disparate treatment claims under the Rehabilitation Act. *See, e.g., Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994). The burden-shifting method of proof under Title VII was first described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). That three-step process requires a plaintiff first to establish a *prima facie* case of disability discrimination by showing that she is a member of a protected class and that the defendant took adverse action against her in circumstances that raise an inference of unlawful discrimination. The defendant must then respond by offering a legitimate, non-discriminatory reason for its adverse employment action. Once the defendant articulates such a reason, the burden returns to the plaintiff to show that the defendant's stated reason is merely pretext for discrimination. *Crawford*, 37 F.3d at 1341. Once a disparate treatment claim has been tried on the merits, however, the fact finder must determine whether the defendant intentionally discriminated against the plaintiff. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983).

 Assuming, *arguendo*, that Plaintiff made out a *prima facie* case, Defendant here

---

**14.** Although the collective bargaining agreement had provisions for permanent light duty status, Plaintiff never made such application.

articulated a legitimate, non-discriminatory reason for its actions. Carmel Bennett testified that she had received a report from Dr. Schwartz recommending that Plaintiff be cleared by her therapist and cardiologist before returning to work.[15] Plaintiff suggests that Bennett fabricated her conversation with Dr. Schwartz, but she advances no adequate basis for questioning Bennett's credibility. Furthermore, Dr. Schwartz testified that he had recommended that Plaintiff be cleared by her therapist before returning to work. The Court, therefore, finds that Defendant did not unlawfully discriminate against Plaintiff by placing her in an off-duty status and mandating a psychiatric fitness for duty examination.

### 3. Hostile Work Environment

■ Disability-based hostile environment claims are analyzed under the Title VII standards for gender-based hostile environment claims.[16] *See, e.g., McClain,* 940 F.Supp. at 301. Title VII is violated when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). To establish a hostile environment claim based on disability, an employee must prove: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based upon her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action. *See Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th Cir. 1982) (applying factors to hostile environment claim based on sexual harassment).

■ The Court finds that Plaintiff was not subjected to disability-based harassment that affected a term, condition, or privilege of employment. In assessing the severity of the conduct of which Plaintiff complains, the Court considered all pertinent circumstances, including whether the discriminatory conduct was frequent or severe, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with Plaintiff's work performance. *See Harris,* 510 U.S. at 23, 114 S.Ct. at 371. Not only must the conduct have been sufficiently severe or pervasive to have created a work environment that was perceived (subjectively) by Plaintiff as abusive, but it also must have been objectively hostile or abusive.

Plaintiff clearly considered her work environment under Joanne Fleszar, Angel Cruz, and Carmel Bennett to be hostile, and she genuinely believed this hostility to be based on her alleged disabilities. She told Dr. Jordan that she attributed her ongoing problems at work to the stigma of her mental condition. According to Plaintiff, her co-workers and supervisors "would think I'm crazy."

Yet, Plaintiff has not established that her work environment was objectively hostile. As Judge Posner has aptly written, the law distinguishes between non-actionable behavior and true hostile environment harassment: "The concept of ... harassment is designed to protect working [individuals] from the kind of ... attention that can make the workplace hellish.... It is not designed to purge the workplace of vulgarity." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430 (7th Cir.1995). The Court finds that Plaintiff routinely misperceived and personalized events in the workplace. Plaintiff viewed all supervisory actions as sinister when they were merely work directives consistent with the supervisors' duty to manage the Post Office. Plaintiff did receive blunt criticism, but such remarks were attributable to her work performance, not to any disability. Joanne Fleszar and Angel Cruz clearly had no-nonsense management styles that were more direct than Plaintiff was accustomed to or would have preferred, but such ap-

---

**15.** The Court notes that Defendant prevailed at an arbitration hearing on the issue of whether it had just cause to place Plaintiff on emergency suspension and send her for a fitness for duty examination.

**16.** To make out a *prima facie* case of harassment under the ADA, Plaintiff must be a qualified individual with a disability, a finding this Court declines to make. For purposes of this hostile environment analysis, however, the court will assume that Plaintiff has met this burden.

proaches are not actionable. And to the extent that Postal Service employees occasionally made adolescent, rude, or insensitive comments about Plaintiff, such offensive utterances were not sufficiently severe or pervasive to create the type of "hellish" environment that is unlawful.

## B. *Retaliation*

Plaintiff alleges that Defendant retaliated against her for filing this November 1994 lawsuit, first by cutting her daily hours from eight to four on January 20, 1995, and then by completely denying her light duty request on January 27, 1995. The governing statute, 42 U.S.C. § 2000e–3(a), states in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees ... because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [its] has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under this subchapter.

Therefore, to establish a claim for retaliatory discharge, a plaintiff must show: 1) that she engaged in statutorily protected expression; 2) that she suffered an adverse employment action; and 3) that there was some causal connection between the two events. *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994). Although not specifically enumerated as an element, a plaintiff must also show that the defendant was aware of the protected expression at the time it took the adverse employment action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993); *EEOC v. Carolina Freight Carriers Corp.*, 723 F.Supp. 734, 748 (S.D.Fla. 1989). If a court finds that the plaintiff has established a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Meeks*, 15 F.3d at 1021. Once the defendant meets its burden of production, the plaintiff must then demonstrate that the defendant's proffered explanation was a pretext for retaliation. *Id.* Although the production burdens shift, the persuasion burden always remains with the plaintiff. *Id.*

■ The Court here finds that Plaintiff has not established a *prima facie* case of retaliation because neither of the decision-makers responsible for canceling her light duty—Pete Stokes and James Plather—were aware of her lawsuit when they took that action. Neither Stokes nor Plather was named as an individual defendant, and neither was served with a summons or complaint; nor had Plaintiff discussed her lawsuit with either individual. Further, Stokes explained that as Postmaster of Fort Lauderdale, he had approximately 1,700 carriers and clerks under his supervision and, therefore, was not routinely notified when one of these individuals filed suit; and he had not been notified of Plaintiffs' suit by January 1995. Although Stokes did acknowledge receiving from Plaintiffs' counsel a June 1994 letter complaining of her client's treatment under the Rehabilitation Act and threatening legal action, this Court cannot infer causation given the seven-month lapse between that June 1994 letter and the January 1995 duty cancellation. *See Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1403 (8th Cir.1992) (no retaliation found where six months passed between protected activity and termination); *Reeves v. Digital Equip. Corp.*, 710 F.Supp. 675, 677 (N.D.Ohio 1989) (no retaliation where three months passed between protected expression and adverse employment action); *Brown v. ASD Computing Ctr.*, 519 F.Supp. 1096, 1116–17 (S.D.Ohio 1981) (discharge four months after protected activity too remote).

■ Yet, even if the duty cancellation here did support an inference of retaliation, Plaintiff failed to prove by a preponderance of the evidence that Defendant's proffered reason for the termination—unsatisfactory work performance—was pretextual. Had Defendant decided to retaliate against Plaintiff for the June 1994 letter it would logically have done so seven months earlier. But not only did Defendant fail to retaliate, it permitted Plaintiff to remain on temporary light duty as a letter carrier while others were required to deliver her route. Moreover, Pete Stokes had good cause for canceling Plaintiff's light duty. Through personal observation, he had verified the customer complaints.[17] On the day he visited N.A.A., he

---

17. As noted *supra,* the customer complaints and

Stokes' concern find support in the statistical

justifiably was upset that route 932 was still in the office at 2:00 or 2:15 p.m. and not yet ready for delivery. Accordingly, he exercised his discretion as Postmaster to cancel her temporary light duty.

Plaintiff counters that she was entitled to progressive discipline under the collective bargaining agreement for performance deficiencies. She further argues that other employees were provided light duty while she was not. But Stokes explained that he did not discipline temporary light duty employees for performance deficiencies because they are not guaranteed any work under the collective bargaining agreement. He elected instead to deny their light duty requests. Defendant's labor relations specialist, Joseph Berezo, corroborated Stokes. He testified that temporary light duty employees are generally not disciplined for poor performance, an assertion that Plaintiff failed to rebut. Further, Plaintiff's evidence that a few other light duty carriers have been provided work since January 1995 does not establish pretext. Plaintiff's light duty request was denied not due to unavailability of work, but due to poor performance. And Plaintiff presented no evidence concerning the work performance of the few light duty carriers who have been given work since January 1995; nor did she offer any evidence suggesting that these light duty employees had not participated in any protected activity.

The focus of the retaliation analysis is the intent of Postmaster Stokes in canceling Plaintiff's light duty in January 1995. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (proof of discriminatory motive is critical in cases under Title VII). The Court finds no intent by Stokes to retaliate against Plaintiff because she filed this lawsuit, sent a complaining letter, or engaged in any other protected activity. The evidence compels the conclusion that he canceled her light duty for legitimate reasons— dissatisfaction with her performance and a desire to provide better customer service.

---

evidence reflecting Plaintiffs poor performance and in the testimonial evidence of the carriers subsequently assigned to Plaintiffs route; they

## IV. CONCLUSION

Plaintiff failed to show that she was discriminated against based on a disability or that her light duty was discontinued in retaliation for having engaged in statutorily protected activity. Accordingly, the Court will enter judgment in favor of Defendant.

DONE AND ORDERED.

---

completed their assignments with significantly more dispatch than did Plaintiff.