Ronald J. CORNWELL, Plaintiff,

v.

DAIRY FARMERS OF AMERICA, INC., et al., Defendants.

No. CIV.A. 03–11208–NMG.

United States District Court, D. Massachusetts.

March 30, 2005.

Patrick J. Bannon, Berin S. Romagnolo, Gadsby & Hannah LLP, Boston, MA, John E. Murray, Cook & Franke S.C., Milwaukee, WI, for American Dairy Brands, Dairy Farmers of America, Inc., James E. Degiorgio, Michael R. Willis, Defendants.

Mark B. Dubnoff, Timothy P. Van Dyck, Edwards & Angell, LLP, Boston, MA, Kevin E. Hyde, Jonathan W. Oliff, Foley & Lardner LLP, Jacksonville, FL, for Acosta Sales and Marketing, Charmaine Derosa, Defendants.

Michael A Zeytoonian, Hutchings, Barsamian, Cross and Mandelcorn, LLP, Wellesley Hills, MA, for Ronald J. Cornwell Plaintiff.

***ORDER ADOPTING REPORT AND RECOMMENDATIONS***

GORTON, District Judge.

Order Adopting Report and Recommendations. After consideration of plaintiff's objections thereto (Docket No. 62), Report and Recommendation is accepted and adopted. Action on motion allowed.

***REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT***

DEIN, United States Magistrate Judge.

## I. *INTRODUCTION*

The plaintiff Ronald J. Cornwell ("Cornwell") was employed as a salesman by the defendant Dairy Farmers of America, Inc. ("DFA"),[1] a company which produces and markets a variety of cheese products, including some under the Borden label. The defendant Acosta Sales and Marketing ("Acosta") is a broker for DFA products, and the defendant Charmaine DeRosa ("DeRosa") is employed by Acosta.[2] Allegedly following complaints by DeRosa about Cornwell's behavior, Acosta complained to DFA and DFA eventually terminated Cornwell's employment. Cornwell has brought suit against DFA claiming age discrimination in violation of Mass. Gen. Laws ch. 151B, § 4(1B) and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–23 and 631; disability discrimination in violation of Mass. Gen. Laws ch. 151B, § 1(17) and the Americans with

---

**1.** Cornwell worked at the defendant American Dairy Brands, the division of DFA responsible for the marketing and manufacture of Borden products. As no distinction between the two defendants has been made in the complaint, they will be collectively referred to as "DFA" unless the context requires otherwise.

**2.** Cornwell's claims against DFA officers Michael R. Willis and James E. DeGiorgio, have been voluntarily dismissed.

Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–2 and 12111; and retaliation in violation of state and federal law. He has also brought suit against Acosta and De-Rosa alleging claims for defamation and tortious interference with a contractual relationship.

This matter is presently before the court on DFA's motion for summary judgment (Docket # 36) and on Acosta and DeRosa's motion for summary judgment (Docket # 41). For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that both motions for summary judgment be ALLOWED.

## II. STATEMENT OF FACTS [3]

### Cornwell's Employment with DFA

Cornwell was born on February 15, 1948. (DFA ¶ 6). He began working for DFA's predecessor, Borden Foods, in April, 1972. (Amended Complaint ("Compl.") ¶ 15; DFA ¶¶ 3, 5). He continued to work for DFA after DFA acquired Borden Foods in 1997. (DFA ¶ 2). Cornwell worked in sales throughout his employment with Borden and DFA. (DFA ¶ 7). He remained with DFA until November 30, 2001, when his employment was involuntarily terminated. (Compl. ¶ 15; Murray Aff. Ex. 27).

DFA is in the business of producing and marketing a variety of cheese products. (DFA ¶ 3). DFA sells products under the Borden label (known as branded dairy products) and under the brand name of the retailer who resells them to consumers (known as private label products). (DFA ¶¶ 3–4). Acosta is a sales and marketing company that serves as a broker, or the sales force, for manufacturers in the food and consumer packaged goods industry, such as DFA. (Acosta ¶ 1). Acosta works with its customers, such as DFA, to place DFA's products in retail stores. (Id.).

For much of his career, Cornwell sold DFA's private label products. (DFA ¶ 8). He reported to Ed Dowd ("Dowd"), DFA's Director of Private Label Sales, who, in turn, reported to Jim DeGiorgio ("DeGiorgio"), Vice President of Sales. (DFA ¶¶ 21, 22). Cornwell consistently received positive reviews and evaluations from Dowd. (See DFA ¶ 9). As DFA itself explains, "[p]rivate label sales fit well with Mr. Cornwell's personality and people skills. Private label sales frequently depend upon strong personal relationships with the customer. Mr. Cornwell was able to develop and maintain positive relationships with these clients." (DFA ¶ 9, internal citations omitted).

### The Reorganization of DFA's Sales Force

In 2000, DFA reorganized its sales force so as to have one salesperson per retail customer, instead of one salesperson discussing private label sales and a different salesperson speaking to the same customer about branded sales. (DFA ¶ 10). This required Cornwell to sell branded products, which involved different presentation skills and a more in-depth understanding of market trends and sales. (See, e.g.,

---

3. DFA filed a "Concise Statement of Undisputed Material Facts" (Docket # 37), cited as "DFA ¶ ___." DFA's exhibits and depositions are attached to the affidavit of its counsel, John E. Murray (Docket # 39), and will be cited as "Murray Aff. Ex. ___." Cornwell filed a "Statement of Disputed Facts" (Docket # 46), cited as "PF ¶ ___." Plaintiff's exhibits are attached to the affidavit of Attorney Michael Zeytoonian (Docket # 49), cited as "Zeytoonian Aff." Acosta and DeRosa filed a Statement of Undisputed Facts (Docket # 42), cited as "Acosta ¶ ___." In response, Cornwell filed a "Statement of Disputed Facts" (Docket # 48), cited as "PA ¶ ___."

DFA ¶¶ 11–20). As Cornwell explained, "[t]his shift in Plaintiff's duties and responsibilities also called upon Plaintiff to interface more with the brokers who worked with DFA on the branded side of the business and to utilize the software and programming technology, which was used more so for the branded side of the business." (*"Plaintiff's Memorandum of Law in Support of Plaintiff's Opposition to Summary Judgment Motion of Defendants Dairy Farmers of America, Inc. and American Dairy Brands"* (Docket # 45) (*"Plaintiff's Mem."*) at 16). With this change, Cornwell started reporting to Mike Willis ("Willis") instead of Dowd. (DFA ¶ 24). Willis, like Dowd, reported to DeGiorgio. (DFA ¶ 25). DFA traces Cornwell's difficulties with the company to this change in management and resulting change in expectations. (*See* DFA ¶ 142). For his part, Cornwell contends that Willis and DeGiorgio "harassed the plaintiff on the basis of his age and/or his disability," "created a hostile work environment" and treated him differently than other similarly situated employees. (Compl.¶¶ 28–29). As detailed below, however, Cornwell has failed to put forth sufficient facts to support these claims.

In May and June 2001, DFA hired Acosta to take over DFA's brokerage business, which had formerly been handled by Marketing Specialists, a broker that had gone bankrupt. (PF ¶ 15). The decision to hire Acosta was made by DeGiorgio, Willis and Jeff Jones of DFA. (PF ¶ 16). As part of the transition, Willis also arranged for two former Marketing Specialists employees, Ernest Vespole and the defendant DeRosa, to join Acosta. (PF ¶ 17). Moreover, during this transition, DFA loaned Acosta $200,000 to assist Acosta with cash flow and past salaries for some of the Marketing Specialists employees who were joining Acosta. (PF ¶ 19). Cornwell points to this close relationship between DFA and Acosta as support for his contention that DFA's stated reasons for terminating his employment, *i.e.*, complaints from Acosta, were pretextual. (*See Plaintiff's Mem.* at 4).

### *Cornwell's Automobile Accident*

In 1999 Cornwell was in a car accident. (DFA ¶ 91). According to Cornwell, as a result of the accident he "suffered a disability, consisting of the conditions of depression, anxiety and Post Traumatic Stress Disorder ('PTSD')," in addition to some shoulder injuries. (*Id.*; Compl. ¶ 26). Following the accident, Cornwell had concerns about traveling at night or in inclement weather. (DFA ¶ 93). DFA, through Dowd, was able to accommodate him by reducing his travels in these conditions. (DFA ¶ 93). In 2000, when Cornwell began reporting to Willis, Cornwell explained that he had difficulty traveling at night or in inclement weather. (DFA ¶ 94). According to DFA, Willis and DeGiorgio expressed a willingness to accommodate Cornwell's concerns, but Cornwell did not request any accommodations. (DFA ¶¶ 94–98). According to Cornwell, DeGiorgio told Willis that "we would need to make a change" to accommodate Cornwell's need, meaning that they would need to make a change so that Cornwell would not have to travel. (*See Plaintiff's Mem.* at 8; Murray Aff. Ex. 6 ("DeGiorgio Dep.") at 33–34). Willis allegedly conveyed this information to Cornwell. (*Plaintiff's Mem.* at 8). Cornwell contends that he understood this to mean that he would be terminated, so he did not ask for any accommodation. (*Plaintiff's Mem.* at 8–9). The plaintiff has not addressed whether or not he actually was obligated to travel at night or in inclement weather after Willis became his supervisor. In any event, even absent any accommodation,

Cornwell believed that he continued to do his job very well. (DFA ¶ 100).

### The Initial Decision to Terminate Plaintiff's Employment

It is undisputed that by May or June 2001, DFA had contemplated terminating Cornwell's employment. (PF ¶ 1; DeGiorgio Dep. at 15–16; Murray Aff. Ex. 33). DFA had advised American Dairy Brands that it had to reduce its expenses by reducing its personnel costs. (DFA ¶ 73). DFA believed that American Dairy Brands was overstaffed and it was pressuring American Dairy Brands to reduce its "head count." (DeGiorgio Dep. at 13–15).[4] DeGiorgio identified two employees—Dave Lavely (in his 30's) and Cornwell (age 53)—as candidates for termination. (DFA ¶¶ 77–78). DeGiorgio recommended that Cornwell be terminated by July 16, 2001 due to performance issues. (DFA ¶ 79–83; Murray Aff. Ex. 33). For example, according to DeGiorgio, Cornwell was one of the worst regional business managers in reconciling deductions given to customers, an important component in determining DFA's profitability. (DFA ¶¶ 80–82; Murray Aff. Ex. 37). Nevertheless, when DeGiorgio recommended that Cornwell be terminated, Sherri Flaker ("Flaker"), the Director of the Human Resources Department ("HR") at DFA, refused to approve the termination. (PF ¶ 2). As Flaker explained, Cornwell had indicated that he was going to sue the company if he was fired, he was in a protected age category and he had an open worker's compensation claim arising from the 1999 car accident. (Id.; DFA ¶¶ 85–90).[5] Also Cornwell was a long time employee and there were no significant performance problems in his

file. (DFA ¶ 87). Consequently, DFA concluded because of Cornwell's age and open worker's compensation claim "the risk was too great to terminate him." (Murray Aff. Ex. 8 ("Flaker Dep.") at 27). Mr. Lavely's employment was terminated instead. (DFA ¶ 84). Cornwell points to Flaker's concerns about a potential discrimination suit by Cornwell as evidence that he was eventually terminated because of his age and/or disability.

Thereafter, Cornwell contends DeGiorgio and Willis engaged in a concerted effort, with the assistance of Acosta, to build a record to justify his termination from DFA. (*See Plaintiff's Mem.* at 4—"the Defendant set out to get a reason to terminate the Plaintiff either by building a case for poor performance or by digging up another reason."). For its part, DFA contends that "[w]hen Mr. DeGiorgio received the news that the human resources department had rejected his recommendation to discharge Mr. Cornwell, he determined Mr. Cornwell must be managed more aggressively so his performance would improve, or he would have a record of poor performance sufficient to justify the discharge of a long-term employee." (DFA ¶ 101). As detailed below, by November, 2001, DFA had concluded that Cornwell had engaged in unprofessional conduct warranting his termination. (Murray Aff. Ex. 27). Cornwell strenuously challenges this conclusion. While this court finds that there are material facts in dispute as to the wisdom of DFA's termination decision, unfortunately for Cornwell, even reading the record in the light most favorable to him does not support a conclusion that DFA was motivated by Cornwell's age or any perceived or real handicap.

---

**4.** DeGiorgio himself lost his job in April 2002 due to downsizing, and Willis was let go in 2004 when his position was eliminated. (PF ¶¶ 73–74).

**5.** Cornwell denies that he told others he would sue if fired. (*See* PF ¶ 36).

### Cornwell's Work Performance

On or about August 13, 2001, after the HR department rejected the suggestion that Cornwell's employment be terminated, Cornwell received a mid-year performance evaluation which was critical of his performance. (PF ¶ 3; Murray Aff. Ex. 13). Therein, Willis expressed concern about Cornwell's performance in his position as a "Region[al] Business Manager for the Branded Business." (Murray Aff. Ex. 13 at 1). Willis noted concerns about Cornwell's use of specific data expected to be used in branded sales, his failure to build a Power Point presentation, his failure to provide accurate and timely monthly travel calendars, and the fact that he "consistently rank[s] the worst in the country on forecasting accuracy" among other things. (*Id.* at 1–2). Willis also noted that he continued "to have a concern in your relationship and involvement with our Brokers. We need to foster relationships with our Brokers that are not adversarial, but are true partnerships ...." (*Id.* at 2). Cornwell responded to his evaluation by an e-mail message dated August 30, 2001 in which he not only defended himself, but also confirmed "for the record that I will do anything to satisfy your needs to effectively deliver the results you expect." (Murray Aff. Ex. 15).

### The Foster Incident

Around this time, the record establishes that Acosta personnel had some complaints about Cornwell. For his part, Cornwell contends that Acosta personnel were encouraged to build a record so as to justify his termination in light of Flaker's concerns that his firing may be viewed as age or disability discrimination. (*See, e.g.,* PF ¶¶ 12–13). Thus, in an e-mail dated August 30, 2001 Jennifer Foster, an employee of Acosta, wrote to her supervisor, Jim Fluhme (at his request), about an incident on August 13, 2001. As she wrote:

> I have been requested, by my supervisor, to document an incident that happened to me on August 13, 2001. Let me start by stating that I am not complaining about any occurances [sic] that happened that day. I never felt threatened nor did I feel offended by any of them. However, I feel it is my obligation to report them after speaking to my supervisor to prevent any future problems that may occur.
>
> I picked Ron Conwell [sic] up at the Cleveland airport early that morning to do audits in the market. During our travels from one store to another I was pulled over for a speeding violation in Middleburg, Ohio. After receiving my ticket from the officer, I beleive [sic] I made a joke that I should have shown some cleavage to get out of the ticket, but it would not have helped because the officer would not even look at me. Ron proceeded to say that it might have done him some good. I brushed the comment off, in fact I may have even chuckled a bit. Later that day I dropped Ron off at the airport. He shook my hand, kissed my cheek and said thank you.

(Murray Aff. Ex. 18).

On August 22, 2001, before he had received Ms. Foster's e-mail, Jim Fluhme ("Fluhme") discussed the incident with Willis, who described his reaction as being "absolutely embarrassed for our Company." (Murray Aff. Ex. 19). When he received Ms. Foster's e-mail, Fluhme forwarded it to Willis, writing "My [t]houghts are that Ron Conwell [sic] was unprofessional in his comment and actions when he worked with Jen Foster on August 13, 2001. I would be appreciative if [sic] if you would see to it that Ron Conwell [sic] not work in the Pittsburgh/Cleveland Market.... Our HR Department would like to

know when this is closed as would I." (Murray Aff. Ex. 19; PF ¶ 13). The parties agree that there was no reason to exclude Cornwell from the Pittsburgh/Cleveland Market since he did no work there anyway. (*See* PF ¶ 13).[6]

On August 31, 2001, Willis forwarded all the correspondence to Flaker of the HR Department, who had previously advised Willis that Cornwell's employment could not be terminated in light of his age and/or unresolved worker's compensation claim, with a copy to DeGiorgio. He asked Flaker "what we need to do next . . . ." (Murray Aff. Ex. 19). DeGiorgio spoke to Cornwell about the incident on September 12, 2001 and sent him a memorandum on September 25, 2001 "as a formal warning that you should not do anything further that could expose you or American Dairy Brands to sexual harassment legal action." (Murray Aff. Ex. 17).

### DeRosa's Complaints

There is evidence in the record that some time before September 4, 2001, DeRosa spoke with Willis and told him that Cornwell had been reading a book entitled "Getting Fired" at Acosta's office. (Dep. Ex. 58 included in PF Ex. E). Cornwell allegedly told DeRosa that "[i]f anybody finds out I'm reading this book, I'll know where it came from." (*Id.*). He also made comments to the effect that "[i]f I go down, everyone goes down" and "[r]evenge is best served on a cold plate." (*Id.*). Willis called Flaker and conveyed this information to her. (*Id.*). He also agreed to obtain a written statement from DeRosa and forward it to Flaker. (*Id.*).

On September 10, 2001, Cornwell attended a meeting with DeRosa at Acosta's New England office, the purpose of which was to reconcile funds. (DFA ¶¶ 48–49). According to DeRosa, Cornwell engaged in bizarre behavior in the morning, although that changed by 11:30 a.m. "and the remainder of the day was uneventful." (Murray Ex. 30 at p. 4). In particular, but without limitation, according to DeRosa, Cornwell was very frustrated and unable to follow what was happening. He was talking to himself and writing himself notes which he then could not understand. (*Id.* at 3). Cornwell was agitated and upset. (*Id.* at 3–4). Another employee allegedly reported to DeRosa that Cornwell made the comment "I should have brought a gun today," although Cornwell denies making the statement. (*Id.* at 3–4; DFA ¶¶ 49–53; PF ¶ 22).

DeRosa communicated her concerns to Willis on or about September 10, 2001.[7] She called Willis and reported Cornwell's behavior. (DFA ¶ 53). Willis asked DeRosa to put her concerns in writing, and

---

6. Cornwell points to this apparent overreaction to an innocuous situation, where Ms. Foster herself admits first joking about showing her cleavage to get out of a ticket, as evidence that DFA's stated basis for termination was pretextual. This court agrees that a jury could find that Fluhme's and Willis' reactions, and the paper trail created relating to the alleged incident, was done to help justify a previously made decision to terminate Cornwell's employment. As detailed *infra*, however, this court also concludes that the record does not support a conclusion that the unstated reason for termination was discriminatory.

7. Cornwell contends that there are disputed facts about who initiated the phone conversation between DeRosa and Willis, and argues that his sequence of events further supports his conclusion that DFA initiated the complaints to build the record against him. (*See, e.g.*, PF ¶¶ 21, 24–25). For purposes of the motions for summary judgment, the court will assume Cornwell's chronology to be true. However, any inconsistencies do not rise to the level of material factual disputes.

she wrote a summary of her comments dated September 11, 2001. (DFA ¶ 54, Murray Aff. Ex. 31). DeRosa's comments were not limited to the events of September 10th, but rather went back to May 14, 2001. She described erratic behavior which was progressively getting worse. (*Id.*).

Specifically, but again without limitation, DeRosa reported that at a meeting on May 14–15, 2001 in Baltimore, Cornwell was complaining about work and about how his bosses were treating him. He allegedly made comments that he would "get his revenge." He also, according to DeRosa, made comments of a sexual nature and became loud and boisterous. (Murray Aff. Ex. 31 at 1).[8]

DeRosa's memorandum also referred to a meeting she had with Cornwell on August 14, 2001 in Baltimore. At that time, Cornwell was very distressed and upset about the negative work comments he was receiving. He said he would "not go quietly or alone." (Murray Aff. Ex. 31 at 1). He said he was "being ostracized by everyone and feeling extremely depressed." (*Id.*). The next day, August 15, 2001, DeRosa saw Cornwell reading the book entitled "Getting Fired," and had the conversation described above. (*Id.*). During the day he repeated (several times) a story about "driving in a car where this woman was pulled over and there was some comment about whether 'showing some cleavage' would help her get out of the ticket, and he indicated he joked w/her that it would 'certainly help with the retail audit.'" (*Id.*). Finally, DeRosa's memoran-

dum referred to her perceptions of Cornwell's behavior on September 10, 2001. (*Id.*).

DeRosa discussed her concerns about Cornwell's behavior with her supervisor, Ernest Vespole, who in turn passed the information on to Acosta's HR department. (DFA ¶¶ 56–59; Murray Aff. Ex. 29). It appears that DeRosa expressed particular concern about Cornwell's actions due to recent news events relating to shootings at work. (Murray Aff. Ex. 30 at p. 4).[9] Acosta complained to DFA about Cornwell's threatening and otherwise inappropriate comments. (DFA ¶¶ 60–62). On October 10, 2001, Vespole asked Willis to reassign Cornwell and remove him from Acosta accounts. (Murray Aff. Ex. 28).

### Cornwell's Objections

Meanwhile, Cornwell's work continued to be reviewed negatively by DFA's new management. For example, on September 12, 2001, Cornwell met with Jim DeGiorgio. As detailed in DeGiorgio's e-mail to Cornwell on that date, DeGiorgio noted some progress but was still not satisfied with his job performance. (Murray Aff. Ex. 20). DeGiorgio also discussed the Foster incident with Cornwell at that time. (*Id.*). Cornwell responded by e-mail dated September 29, 2001. Therein he asserted that he had "almost 30 years of dedicated service to this company and all of the sudden I am being singled out and in my mind being treated very unfairly and unjustifiable [sic] by people who don't work with me on a continual basis and are judg-

---

8. Among the comments Cornwell allegedly made was that if he had to go to prison, he would want a sex change so that he could be placed with women, and that it didn't matter if he was no longer a man since he would "still be able to 'touch them' [while indicating—his hands to a woman's chest]." (Murray Aff. Ex. 31). Cornwell admits making

some comments but disputes the exact words and puts any discussion in the context of a discussion about a television show about sex change operations.

9. DFA later determined that Cornwell did not pose any threat to his fellow employees. (Murray Aff. Ex. 27).

ing me on someone else's perceptions and individuals motives." (*Id.*). He strenuously denied participating in any sexual harassment. He further asserted as follows:

> I feel that since the date of suffering serious injuries while pursuing the interests of American Dairy Brands, certain individuals appear to be taking individual or concerted actions to drive me from my position in the workplace in violation of laws preventing discrimination based on age or perceived or real handicap. I am formally asking that the Human Resource Department investigate my situation.

(*Id.*). Cornwell had expressed the same concerns in a September 26, 2001 telephone conversation with Flaker, and it appears from the record that Cornwell was under considerable stress due to all the negative comments he was receiving. (Murray Aff. Ex. 22; PF ¶ 26).

On October 4, 2001, Flaker responded to Cornwell's concerns in an e-mail, with a copy to DeGiorgio and Willis. (Murray Aff. Ex. 23). Therein, she noted that a meeting would be held on October 12, 2001 to discuss Cornwell's job performance. She further asserted that she would investigate his claims of discrimination upon receipt of a formal complaint, including the names of the people involved and the specifics of the alleged discrimination. (Murray Aff. Ex. 23).

Cornwell filed a formal complaint by letter dated October 6, 2001. Therein he asserted that he has "been the victim of discriminatory offenses and harassment in the workplace by my direct supervisor Mike Willis and his superior Jim DeGeorgio." (Murray Aff. Ex. 24). As he went on, "[s]pecifically after almost 30 years of

service and above standard performance reviews I am being singled out by Mike Willis and Jim DeGeorgio with hurtful innuendoes and untruths that has led me to the fact that I am being targeted for dismissal." (*Id.*). While Cornwell asserted that he believed the actions were being taken "in direct violation of laws preventing discrimination based on age or perceived or real handicaps," he asserted no reasons for that conclusion, other than he was being forced out. (*Id.*).

Cornwell's claim of discrimination was forwarded to Vince Kubik ("Kubik"), the Manager of Labor and Employee Relations in DFA's corporate officers. (Murray Aff. Ex. 26). Kubik spoke to Cornwell on October 16, 18 and November 26, and also interviewed other supervisors and employees. (*Id.*). During the same period, Flaker was communicating with Cornwell about Acosta's complaints. (*See* notes of phone interview with Cornwell dated 10/16/01, Murray Aff. Ex. 25). Cornwell was placed on leave on or about October 18, 2001. (PF Ex. E at Dep. Ex. 71).

### DFA's Investigation of Acosta's Complaints

Flaker, DFA's Director of Human Resources, conducted an investigation into Acosta's complaints, which Cornwell contends was inadequate and evidence of improper motive. (PF ¶¶ 29, 30; DFA ¶¶ 63, 64). In particular, Cornwell argues that Flaker had been charged with trying to find a way to get rid of him since July, 2001, and was not impartial. In her investigation, Flaker spoke with Cornwell and eight other witnesses, and Cornwell was given an opportunity to respond to the claims against him. (*See* Murray Aff. Ex. 25, 27, 35).[10] Flaker issued a report to her

**10.** Flaker spoke to DeRosa during this investigation at which time DeRosa reiterated her

earlier complaints and said that Cornwell had made some inappropriate comments about a

supervisor, Harold Papen, Corporate Vice President, Human Resources, on November 13, 2001. Cornwell notes that the report fails to include any of the positive comments made during the investigation, and fails to include even an interview with his supporter and prior supervisor, Dowd. (*See* Murray Aff. Ex. 35). Flaker concluded that Cornwell's "conduct and comment to people at Acosta were inappropriate on more than one occasion while representing American Dairy Brands." (*Id.* at p. 4). She also noted that the loss of Acosta left Cornwell with only two accounts—only 25% of a full-time job for a Regional Business Manager. (*Id.* at p. 5).

Harold Papen sent a termination letter to Cornwell dated November 29, 2001. (Murray Aff. Ex. 27). Therein, he recounted the results of the investigation and noted that Acosta represented approximately 60% of Cornwell's workload. (*Id.* at p. 1). He concluded that there was "no evidence that [Cornwell] intended to harm anyone or presented a credible threat of violence in the workplace." (*Id.* at 2). Nevertheless, DFA determined that Cornwell had "made inappropriate sexual remarks while [he was] representing Dairy Farmers of America in the field." (*Id.*). As he concluded:

> Regardless of whether a court may consider your conduct to be unlawful sexual harassment, we find it inappropriate and unacceptable from an employee representing our Company. Acosta also found it sufficiently inappropriate and unacceptable that they will not allow you into any of their offices. During your present leave of absence, Puerto Rico has stated to us that they felt that Ed Dowd was better for their business. In

acknowledging this statement from another respected business partner, more than 75% of your job responsibilities have been eliminated.

(*Id.*). Cornwell's employment was terminated effective November 30, 2001. (*Id.*). The termination decision was made by Papen and Flaker. (*Id.;* DFA ¶ 1). Cornwell contends that Willis and DeGiorgio were also involved in the decision to fire him. (PF ¶ 34).

### Composition of DFA's Sales Department

Around the time of the termination of Cornwell's employment with DFA, 11 of the 14 employees in the sales department were over the age of 40. (DFA ¶ 143). When Cornwell was 56, Willis was 46 and DeGiorgio was 52. (DFA ¶¶ 147–48). Willis supervised six regional business managers, including Cornwell, one of whom was under 40 and the other five ranged in age from 46 to 61. (DFA ¶¶ 144–52). After his departure, Cornwell's work was spread among existing employees. (*See* PF Ex. F at Dep. Ex. 85; Murray Aff. Exs. 32, 33).

### DFA's Investigation of Cornwell's Discrimination Claims

Following the termination of Cornwell's employment, Kubik issued a letter, dated December 4, 2001, concluding that there had been no discrimination. As Kubik found with respect to Cornwell's age discrimination claim:

> In your complaint you objected to the amount of oversight you have received and what you perceive to be overly critical performance appraisals. Perhaps Mike Willis' and Jim DeGiorgio's work-

---

dildo. (Acosta ¶ 28). Cornwell denies this incident. (*Id.;* PA ¶ 5). In addition, DeRosa reported that Cornwell had said "you have to touch it every day" and had written the state-

ment on an empty donut box. (Acosta ¶ 29). While DeRosa believed the comments had sexual overtones, Cornwell denies that it had any sexual connotations at all. (PA ¶ 8).

ing style is different and more stringent than under your previous reporting structure, but this does not constitute age discrimination. Additionally, everyone else in the department works under the same working style. The instances you cited in your complaint appear to be performance related and not age related. To conclude that performance was merely a pretext used to mask age bias doesn't make sense when you consider that 11 of the 14 employees within the Sales Department are over age 40. Mike and Jim appear to be holding all employees to the same expectations. They appear to be supervising all employees in the same way.

(Murray Aff. Ex. 26). With respect to Cornwell's claim of disability discrimination, Kubik concluded:

As a result of your work related automobile accident you contend that you have been diagnosed with and are being treated for *Post Traumatic Stress Disorder.* According to your statement on November 26, 2001, this condition "has not affected my ability to do my job." To support this claim you went on to say that "your numbers are up there", "sales are very good", "having an outstanding year." You maintain that, "I am not getting special treatment and I am not asking for it." You acknowledged that you have never asked for any special accommodations to allow you to do your job because such accommodations are not necessary. None of the people I talked with in the investigation mentioned your accident or anything about a disability you were suffering from. Since you yourself are saying the accident is a non-issue within American Dairy Brands and no one else even mentioned it, I can only conclude that performance is the issue.

(*Id.*). Apparently unaware that Cornwell's employment had been terminated, Kubik recommended that Cornwell proceed with a meeting with Willis and DeGiorgio to discuss his job performance and goals. (*Id.*).

On January 2, 2002, Cornwell filed a claim of age and handicap discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the EEOC. (Murray Aff. Ex. 1). On July 2, 2002, the MCAD dismissed the complaint, concluding that it was "unable to conclude that the information obtained establishes a violation of the statutes." (Murray Aff. Ex. 2). Cornwell appealed, and on November 21, 2002, the MCAD affirmed its earlier finding of Lack Of Probable Cause, meaning "that investigation and appeal evidence fails to establish sufficient evidence to determine that an unlawful act of discrimination has been committed." (Murray Aff. Ex. 3). Cornwell then commenced an action in the Norfolk Superior Court. DFA removed the action to this court.

Additional facts, especially those relating to the claims against Acosta, will be provided below where appropriate.

### III. DISCUSSION

#### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir. 2004). "Once the moving party has assert-

ed that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue." *Id.*

"Neither conclusory allegations nor improbable inferences are sufficient to defeat summary judgment. Rather, to withstand a properly supported motion for summary judgment, the opposing party must present enough competent evidence to enable a factfinder to decide in its favor on the disputed claim. Evidence that is merely colorable or is not significantly probative cannot deter summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236–37 (1st Cir.2002) (internal punctuation and citations omitted). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003) (internal quotations omitted).

Applying these principles to the instant case compels the conclusion that the motions for summary judgment should be allowed.

**B.** *Disability Claim*

■ Cornwell alleges in Count II of his complaint that DFA violated the Americans with Disability Act of 1990, 42 U.S.C. §§ 12101 et seq. ("ADA" or the "Act"), and its Massachusetts counterpart, Mass. Gen. Laws ch. 151B, § 4, by terminating his employment and failing to accommodate his disability.[11] (Compl.¶¶ 1, 59–66). DFA has moved for summary judgment on this

claim on the grounds that Cornwell is not "disabled" under the Act. This court agrees and therefore recommends that Cornwell's disability discrimination claim be dismissed.

The ADA defines "disability" with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). *Accord* Mass. Gen. Laws ch. 151B, § 1(17). Thus, a claimant must, as a first step, prove that he or she has a physical or mental impairment. *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 194, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002). For purposes of the present motion only, DFA concedes that Cornwell suffers from a shoulder injury, depression and PTS, which DFA concedes are impairments. ("*Memorandum of Reasons in Support of [DFA's] Motion for Summary Judgment*" (Docket # 38) ("*DFA Mem.*") at 5). Where the dispute lies, however, is whether Cornwell satisfies the remaining criteria necessary to find a disability under the Act. Cornwell argues that he is disabled within the meaning of the ADA because these impairments limit certain of his major life activities and because DFA regarded him as impaired. However, the undisputed facts do not support Cornwell's position.

■ "Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. at 195,

---

11. In all aspects relevant to the instant case, the Massachusetts counterpart to the ADA, Mass. Gen. Laws ch. 151B, § 4, tracks the ADA, so no separate analysis is necessary.

*See Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 20 n. 5 (1st Cir.2002); *Shedlock v. Dept. of Corr.*, 442 Mass. 844, 853, 818 N.E.2d 1022, 1031–32 (2004).

122 S.Ct. at 690. Moreover, the limitation on the major life activity must be "substantial," *i.e.*, "considerable" or "to a large degree." *Id.* at 196–97, 122 S.Ct. at 690, 691. *See also Calero–Cerezo v. U.S. Dept. of Justice*, 355 F.3d at 21–22. Finally, "[t]he impact of the impairment must also be permanent or long term." *Benoit v. Technical Mfg. Corp.*, 331 F.3d at 176. The burden is on the plaintiff to establish that he suffered from a disability under the Act, and "the determination of whether a plaintiff has a disability must be made on a case-by-case basis." *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d at 20.

■ In the instant case, Cornwell contends that the impairments he suffered as a consequence of his 1999 automobile accident impacted on the "major life activities" of sleeping and working. (*Plaintiff's Mem.* at 6). Assuming, *arguendo*, that these constitute major life activities, his ability to perform them was not substantially limited. To be substantially limited, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. at 198, 122 S.Ct. at 691 (addressing substantial limitations in performing manual tasks); *Wood v. Crown Redi–Mix, Inc.*, 339 F.3d 682, 685 (8th Cir.2003) (same standard applies to ADA claims concerning non-manual task limitations). As the court noted in *Wright v. CompUSA, Inc.*, 352 F.3d 472, 476 (1st Cir.2003), the Equal Employment Opportunity Commission regulations "define 'substantially limits' as (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to

the condition, manner, or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." 29 C.F.R. § 1630.2(j)(1). Factors to be considered in determining whether an individual is substantially limited in a major life activity are (i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, and (iii) the permanent or long term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)." (internal punctuation omitted).[12] Cornwell has not met any of these criteria.

With respect to sleeping, Cornwell has submitted evidence of only a minimal impact, if any. Thus, he contends that his shoulder pain occasionally interrupted his sleep, but he could take an Ambien and go back to sleep. (Murray Aff. Ex. 4 ("Cornwell Dep.") at 83, 85). He further states that his depression caused him on occasion to sleep more than he used to. (Cornwell Dep. at 85). There is no evidence in the record, however, that his sleeping patterns differed from that of the general population, were in any way severe, or are expected to continue on a long-term or permanent basis. Similarly, there is no evidence that any sleeping "impairment" impacted his job or his ability to perform any day-to-day activities. Consequently, Cornwell's claim of disability under the ADA based on his limitation on the major life activity of sleeping must fail.

■ Similarly, Cornwell cannot prevail on his claim that he was substantially limited in the major life activity of working.

---

**12.** EEOC regulations are relevant for guidance in applying the statutory terms under the ADA, but are not controlling. *See Carroll v. Xerox Corp.*, 294 F.3d at 239 n. 8; *Guzman–Rosario v. United Parcel Service, Inc.*, 397 F.3d 6 (1st Cir.2005).

"[T]o determine whether a substantial limitation exists when work is at issue, [courts] have looked to whether plaintiff can show that he or she is significantly restricted in his or her ability to perform 'a class of jobs' or 'a broad range of jobs in various classes.'" *Carroll v. Xerox Corp.,* 294 F.3d at 239 (internal citation omitted). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* at 240 (internal quotation and citation omitted). In the instant case, Cornwell does not contend that he could not work in a broad range of jobs. In fact, he contends that he could perform his job "very well" even up to the point of his discharge. (Cornwell Dep. at 88). The undisputed facts establish that Cornwell could indeed perform all of his job responsibilities, he simply could not perform them to his new supervisor's satisfaction. However, "his inability to work under a particular supervisor simply is not a substantial limitation on working." *Hatfield v. Quantum Chem. Corp.,* 920 F.Supp. 108, 110 (S.D.Tex.1996). Under such circumstances, he cannot prevail on his claim that his ability to conduct the major life activity of work was substantially impaired.

██ Cornwell further contends that as a result of the 1999 accident, he has had difficulty playing the guitar, lifting things above his head, working out, golfing and playing with his children. (DFA ¶ 99). These "limitations," however, simply do not rise to the level of a significant restriction on a major life activity. *See, e.g., Kirkendall v. United Parcel Service, Inc.,* 964 F.Supp. 106, 111 (W.D.N.Y.1997) (restrictions on sports activities and horseplay with children do not constitute a disability under the ADA); *Wood v. Crown Redi–Mix, Inc.,* 339 F.3d at 685–86 (where claimant can perform numerous household tasks and care easily for himself, impairments in ability to stand, turn, bend or lift not severe; "[t]hey are real, and they certainly inconvenience his life, but they are insufficient to sustain an ADA claim ...."); *Cooper v. Olin Corp., Winchester Div.,* 246 F.3d 1083, 1088 (8th Cir.2001) (depression does not constitute substantial limitation where complainant successfully lives alone and cares for herself and home); *Gazaway v. Makita U.S.A., Inc.,* 11 F.Supp.2d 1281, 1284, 1286–87 (D.Kan. 1998) (post traumatic stress disorder did not substantially limit plaintiff's ability to work). Accordingly, Cornwell has not established that he is "disabled" under the ADA as a result of his impairments.

██ Finally, Cornwell claims that he was "regarded" as being disabled by DFA and, therefore, "should be protected, as someone who whether actually impaired or not, may be the victim of stereotypic assumptions, myths, and fears regarding such limitations." *Benoit v. Technical Mfg. Corp.,* 331 F.3d at 176 (internal punctuation and citation omitted). However, "[a] plaintiff claiming that he is 'regarded' as disabled cannot merely show that his employer perceived him as *somehow* disabled; rather he must prove that the employer regarded him as disabled *within the meaning of the ADA.*" *Id.* (quoting *Bailey v. Georgia–Pacific Corp.,* 306 F.3d 1162, 1169 (1st Cir.2002)). In the instant case, Cornwell may be able to establish, at most, that DFA regarded him as needing to avoid night-time travel and travel in inclement weather. There is no evidence whatsoever to support the conclusion that DFA perceived him as being unable to perform his own job, much less a broad range of jobs. Consequently, this court recommends that Cornwell's claim of disability discrimination be dismissed.[13]

13. With respect to his claim that DFA failed to accommodate his alleged disability, Corn-

## C. *Age Discrimination*

In Count I of his complaint, Cornwell contends that DFA discriminated against him on the basis of age in terminating his employment and subjecting him to harassment and a hostile work environment in violation of Mass. Gen. Laws ch. 151B, § 4(1B) and the ADEA, 29 U.S.C. § 623(a)(1). Because Cornwell has failed to put forth sufficient evidence for a jury to find that DFA was motivated by a discriminatory animus, this court recommends that the age discrimination claim be dismissed.

■ The ADEA and Mass. Gen. Laws ch. 151B make it illegal for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[14] "Where, as here, an employee lacks direct evidence that the employer's actions were motivated by age animus, the *McDonnell Douglas* burden-shifting framework dictates the progression of proof." *Suarez v. Pueblo Intern., Inc.*, 229 F.3d 49, 53 (1st Cir.2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973)). Thus, the plaintiff must first make a *prima facie* case of age discrimination, *i.e.*, must demonstrate "that (i) the plaintiff was over the age of forty, (ii) his work was sufficient to meet his employer's legitimate expectations, (iii) his employer took adverse action against him, and (iv)

the employer sought a replacement with roughly equivalent job qualifications, thus revealing a continued need for the same services and skills." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 823 (1st Cir.1991). In the instant case, DFA has conceded for purposes of its summary judgment motion that Cornwell has established a *prima facie* case of discrimination, so no further discussion is warranted.

In response to the plaintiff's establishment of a *prima facie* case, "the employer need only produce enough competent evidence, *taken as true*, to enable a rational factfinder to conclude that there existed a nondiscriminatory reason for the challenged employment action .... At that point, the employee 'must demonstrate that the proffered reason for the adverse employment action was simply a pretext for age discrimination,' ... which in turn requires that the employee proffer enough competent evidence to support *two* findings: 1) the employer's proffered reason was pretextual; *and*, 2) its true motive was age discrimination ... [t]he burden of *persuasion* remains on the plaintiff employee at all times." *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 248 (1st Cir.1997) (internal citations omitted). *Accord Shorette v. Rite Aid of Maine, Inc.*, 155 F.3d 8, 12–13 (1st Cir.1998).

In the instant case, DFA has put forth sufficient evidence of a nondiscriminatory reason for the employment actions about which Cornwell is complaining. DFA contends that Cornwell was being supervised

---

well also has not put forward sufficient evidence that he actually requested an accommodation—he seems to have made a strategic decision not to do so. In any event, under a failure to accommodate theory, Cornwell must still make a "threshold showing of disability," which he has failed to do. *Carroll v. Xerox Corp.*, 294 F.3d at 237.

14. Specifically, Mass. Gen. Laws ch. 151B, § 4(1B) makes it unlawful "[f]or an employer in the private sector, by himself or his agent, because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."

closely because of his new job responsibilities and performance issues, and that he was discharged in response to complaints of unprofessional and inappropriate behavior toward Acosta employees. "This explanation satisfies [DFA's] burden of providing a nondiscriminatory reason for its conduct." *Benoit v. Technical Mfg. Corp.*, 331 F.3d at 174 (claim that employee discharged for persistent lateness, frequent absences and unwillingness to work cooperatively with his supervisor meets employer's burden).

 "Where, as here, the employer proffers a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the reason was a coverup for a discriminatory decision." *Id.* (internal quotations and citation omitted). DFA contends that the reasons given were not pretextual, and points to the correspondence relating to the Acosta incidents and DFA's own investigation of the incidents.[15] Cornwell has spent a great deal of time arguing that the reasons given were pretextual, and that DFA, with Acosta's assistance, was simply building a record to support his termination. Even assuming that Cornwell has raised a disputed issue of fact as to whether the reason given was pretextual, he has not provided sufficient evidence for a jury to believe that DFA's actions masked age discrimination.[16]

Even reading the record in the light most favorable to Cornwell, Cornwell paints a picture showing that DeGiorgio suggested terminating his employment in July 2001 because American Dairy Brands had to reduce its payroll expenses, and because DeGiorgio was not satisfied with Cornwell's ability to handle the new responsibilities which accompanied his new duties involving the sale of branded products. There are facts and figures which show that while Cornwell excelled in certain areas of his job, there were other areas in which his numbers were among the worst of the sales force. Cornwell has not established that the decision to expand his job responsibilities to include branded sales was anything other than a business decision—there is no evidence in the record that it was based on any consideration of his age. Similarly, Cornwell has not proffered any evidence which would support a finding that DeGiorgio's suggestion in July, 2001 to terminate his employment was based on Cornwell's age. The failure to establish that the initial decision to terminate Cornwell's employment was due to his age is fatal to his claim.

Cornwell points to the fact that Flaker of the HR department was concerned that Cornwell's termination could result in an age (or disability) discrimination claim being made as proof that such a claim would be meritorious. However, such a conclusion is not supported by the record. At most, the record shows that Flaker believed that Cornwell satisfied at least some of the elements of a *prima facie* case, *i.e.*, was over 40 and could perform the functions of his job. Given the choices of salesmen who could be let go, Flaker recommended that the employment of the one who would go most quietly be terminated.

---

**15.** DFA contends that it does not matter if the incidents complained of actually happened, since DFA believed Acosta's reports of events. *See Mesnick v. Gen. Elec. Co.*, 950 F.2d at 824 ("In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." (internal quotation omitted)). This argument, however, is not persuasive in this case in light of Cornwell's claim that DFA orchestrated the reports and was aware that the reports were exaggerated.

**16.** In light of Cornwell's failure to prove discriminatory animus, there is no need to parse each objection raised by DFA, and Cornwell's response to each claim.

This fact of corporate life cannot, on this record, be stretched to support the conclusion that Flaker believed that any discrimination claim Cornwell might make had any merit.

Cornwell argues further that a jury can infer that DFA's actions in seeking to justify a termination decision were, in fact, masking a discriminatory intent. It is true that "evidence constituting a prima facie case along with evidence of pretext can defeat summary judgment 'provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'" *Estades–Negroni v. Assocs. Corp. of N. Am.*, 345 F.3d 25, 32 (1st Cir.2003) (quoting *Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 22 n. 5 (1st Cir.1999)). However, no such inference is reasonable in the instant case.

Even if DFA was intent on "building a record," Cornwell provided at least some of the building material. He does not dispute making many of the comments at issue and the record does not show that Foster and DeRosa fabricated their stories out of whole cloth. Cornwell contends that DFA and Acosta exaggerated the significance of the events and took statements out of context. Such nuances, however, standing alone are insufficient for a jury to infer discriminatory animus. Cornwell "must do more than cast doubt on the rationale proffered by the employer." *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d at 248 (summary judgment granted in favor of employer where plaintiff asserted only that he must have been discriminated against because of his age because his work record was improving at the time of his termination. *Id.* at 249–50).

Cornwell has failed to identify any other fact from which a jury could infer that DFA was motivated by his age. For example, there is no evidence of any comments which were made which would support a finding of discriminatory animus. *Compare Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 57 (1st Cir.2000) (where nondiscriminatory reason given by employer and comments made by employer evidenced a desire to terminate plaintiff's employment because she was a female, summary judgment not warranted in sex discrimination claim). Moreover, the DFA sales force continued to have persons over the age of 40. *See Mesnick v. Gen. Elec. Co.*, 950 F.2d at 826 (one age-related comment and fact that the ages of candidates for a position were listed, were insufficient, "viewed singly or in combination," to "allow a rational jury to find that GE had a hidden, age-oriented agenda"). The record is simply devoid of any evidence to support a claim of age discrimination.

The court cannot "assume the role of a super personnel department, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d at 250 (internal punctuation and citation omitted). Thus, "relief will not be granted to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision." *Id.* (internal quotation and citation omitted). Absent such evidence, Cornwell's claim of wrongful discharge must fail. *See Shorette v. Rite Aid of Me., Inc.*, 155 F.3d at 15 ("Although [plaintiff] disputed these assessments [of his job performance], his personal opinion regarding his own job qualifications is not sufficiently probative on the issue of pretext"; summary judgment in favor of employer on age discrimination claim).

### D. *Hostile Work Environment*

Cornwell also contends that as a result of age and/or disability discrimination he was subjected to a hostile work environment. This argument must fail not only because he has not established that he was disabled under the ADA or that DFA was motivated by discriminatory animus, but also because Cornwell has failed to allege sufficient facts from which a jury could find a change in working conditions sufficient to maintain this claim.

 The discrimination laws make it unlawful to "requir[e] people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 20, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (addressing Title VII of the Civil Rights Act of 1964). Thus, there is unlawful discrimination "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Id.* at 21, 114 S.Ct. at 370 (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). To determine whether an environment is "hostile" or "abusive," the court looks at all the circumstances, including, without limitation, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371. Finally, "the hostile work environment standard" is more demanding than "a general civility code." *O'Rourke v. City of Providence,* 235 F.3d 713, 729 (1st Cir. 2001) (internal quotation and citation omitted); *Rio v. Runyon,* 972 F.Supp. 1446, 1459 (S.D.Fla.1997) (substantially same

standard applies to disability-based hostile environment claims).

In the instant case, Cornwell's job responsibilities did change from private to branded sales, but there is no evidence that that was the result of anything other than a business strategy. The change, which affected others in the sales force, was not discriminatory or abusive.

 Cornwell has also alleged that he was subjected to strict reviews and oversight. However, "[s]uch scrutiny does not constitute adverse employment action which is one that imposes a 'change in working conditions that materially disadvantage an employee.'" *Flanagan–Uusitalo v. D.T. Indus., Inc.,* 190 F.Supp.2d 105, 117 (D.Mass.2001) (internal citation omitted). Here there has been "no objective evidence that [he] has been disadvantaged with respect to salary, grade, or other objective terms and conditions of employment." *Id.* (internal quotation and citation omitted).

The instant situation is similar to that presented in *Martin v. Inhabitants of City of Biddeford,* 261 F.Supp.2d 34, 38–39 (D.Me.2003), where the plaintiff complained of demeaning and humiliating behavior on the part of her boss, including an allegation that "her supervisor made false and embarrassing statements to a colleague that the plaintiff had been 'talking sex' with the chief of police." In entering summary judgment in favor of the employer on claims of wrongful retaliation, the court held that "while the personal animus, hostility, disrespect, and ostracism alleged here certainly indicate that the plaintiff's workplace was not an idyllic retreat, they fail to constitute a material change in the terms, conditions, or privileges of the plaintiff's job." *Id.* at 38 (internal quotation and punctuation omitted). The same results should be reached here. *See also Rio v. Runyon,* 972 F.Supp. at 1459–60

(new supervisors "clearly had no-nonsense management styles that were more direct than Plaintiff was accustomed to or would have preferred, but such approaches are not actionable"). Consequently, this court recommends that Cornwell's claims based on hostile work environment be dismissed.

### E. *Retaliation*

In Count III of his complaint, Cornwell alleges that "[t]he harassment of the Plaintiff, the subjecting of the Plaintiff to a hostile work environment, and the termination of the Plaintiff by the Defendants DFA, Willis and DeGiorgio constituted retaliation against the Plaintiff for his lawful and appropriate internal complaint against Defendants Willis and DeGiorgio." (Compl.¶ 60). He also contends that these actions were in response to his request for accommodation of his disability. (*Plaintiff's Mem.* at 4). At oral argument, plaintiff indicated that the "internal complaint" was the formal complaint to Flaker on October 6, 2001, although in his pleadings he contends that he "first put the Defendant on notice of his harassment on August 30, when he responded to his August 13, 2001 mid-year review by e-mailing his letter to Willis, copying Flaker and DeGiorgio." (*Plaintiff's Mem.* at 9). In any event, for the reasons detailed below, this count fails to state a claim, and this court recommends that Cornwell's claim of retaliation be dismissed as well.

 "To prove a claim of retaliation, a plaintiff must establish that (1)[he] engaged in protected conduct; (2)[he] experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Calero–Cerezo v. U.S. Dept. of Justice*, 355 F.3d at 25. "Once the plaintiff has made a *prima facie* showing of retaliation, the *McDonnell Douglas* burden-shifting approach is em-ployed, and defendant must articulate a legitimate, non-retaliatory reason for its employment decision. If the defendant meets his burden, the plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Id.* at 26. In reviewing a claim in the context of summary judgment, "the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus." *Id.* (quoting *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir.1996)). Even an individual who is found not to be a "qualified individual with a disability" may pursue a claim of retaliation under the ADA. *Wright v. CompUSA, Inc.*, 352 F.3d 472, 477 (1st Cir.2003).

 Here, Cornwell has failed to establish that his dismissal was causally related to his complaints about DeGiorgio and Willis. Consequently, his claim for wrongful retaliation must fail. *See Santiago–Ramos v. Centennial PR Wireless Corp.*, 217 F.3d 46, 57–58 (1st Cir.2000) (absent evidence that termination was in retaliation for plaintiff's opposition to company policy, summary judgment granted to employer on retaliation claim). According to the undisputed facts, DFA (American Dairy Brands) had slated Cornwell for termination in July 2001 due to its need to reduce expenses and Cornwell's job performance. Even accepting Cornwell's theory as true, that DFA accumulated and exaggerated anecdotal information to justify its earlier decision to terminate his employment, there is no evidence that his complaining about Willis and DeGiorgio was a motivating factor in his eventual

termination.[17] Absent such a causal connection, his claim of retaliation must fail. *See McMillan v. Mass. Soc. for the Prevention of Cruelty to Animals,* 140 F.3d 288, 309 (1st Cir.1998) (where employee "presented no evidence of a causal link between her termination and the filing of her complaint," summary judgment entered in favor of employer on retaliation claim).

Similarly, Cornwell's contention that he was subjected to a hostile work environment and harassment in retaliation for his complaints is not supported by the record. First of all, as detailed above, Cornwell has not established a change in condition of employment sufficient to constitute a hostile work environment. Second, the change in job responsibilities and the critical evaluation of his work predate any of his complaints about DeGiorgio and Willis and, therefore, cannot be retaliation for such complaints. *See Sullivan v. Raytheon Co.,* 262 F.3d 41, 48–49 (1st Cir. 2001) (claim of retaliation dismissed where protected activity—*i.e.,* filing of complaint—occurred after the adverse employment action). Finally, even if Cornwell had established a change in condition of employment, the record does not support Cornwell's assumption that DeGiorgio and Willis were motivated by Cornwell's age or alleged disability. For all these reasons, Cornwell's claim that the hostile work environment was causally related to discriminatory animus must fail. *See Flanagan–Uusitalo v. D.T. Indus., Inc.,* 190 F.Supp.2d at 116 (absent evidence that alleged adverse employment action was motivated by retaliation, summary judgment entered in favor of employer).

■ Cornwell's last contention, that he was harassed and eventually fired in response to his request for accommodations due to his disability, is also not supported by the record. *See Benoit v. Technical Mfg. Corp.,* 331 F.3d at 177 (court assumes that a request for accommodation "brings him within the ambit of 42 U.S.C. § 12203(a)" prohibiting retaliation). According to Cornwell, in response to his notice to Willis that he could not travel at night or in inclement weather, DeGiorgio made an ambiguous comment, which Cornwell heard about from Willis. It appears that Cornwell read much more into the statement than DeGiorgio intended, although this court's conclusion would not change even assuming Cornwell is correct that DeGiorgio meant he would be terminated if he pursued his request for accommodation. Cornwell did not pursue his request for accommodation. There is no evidence that Cornwell's termination, almost two years after he began working for Willis, was in any way linked to Cornwell's travel restrictions. Similarly, there is no evidence in the record that Cornwell's treatment by Willis and DeGiorgio was in any way influenced by their knowledge of Cornwell's travel restrictions.[18] In fact, it appears that the demands imposed on Cornwell by his new position were the same as those imposed upon other employees working for Willis and DeGiorgio. The record does not support a finding of retaliatory misconduct in response to a request for accommodation.

---

**17.** While plaintiff argues that he was terminated "immediately after Plaintiff advised the Defendant of his complaints of harassment based on age and/or disability" (*Plaintiff's Mem.* at 19), he actually complained in August, 2001 and was not terminated until November, 2001.

**18.** In fact, DFA's internal investigation conducted by Kubik found that Cornwell's alleged disability was irrelevant to his treatment at the company, and Cornwell has not put forth any evidence disputing that conclusion.

For all these reasons, this court recommends that summary judgment be entered in favor of DFA on Counts I (Age Discrimination), II (Disability Discrimination), and III (Retaliation) of the amended complaint.

### F. *Defamation*

In Count IV of his complaint, Cornwell has brought a claim for defamation against Acosta and DeRosa. Acosta contends that this claim is limited to three comments: (1) the statement by DeRosa and Debra Tenney ("Tenney"), Acosta's Regional HR Business Partner, to DFA reporting that Cornwell had acted inappropriately toward Foster; (2) the statement by DeRosa and Fluhme to Willis that Cornwell had acted unprofessionally; and (3) DeRosa's statement that Cornwell was a threat to the safety of Acosta's employees. (Acosta ¶ 3). Cornwell rejects this limited view of his defamation claim, and argues, instead, that all the statements made and written by DeRosa which were the basis of the complaints to DFA were "endorsed" by Acosta and were defamatory. (PA ¶ 1). Thus, Cornwell contends that DeRosa's oral and written reports about Cornwell's alleged behavior made to Acosta personnel, including Tenney (of HR) and Vespole (DeRosa's supervisor), and to DFA personnel, including Willis and Flaker, were defamatory. (*See Plaintiff's Acosta Mem.* (Docket # 47) at 9). Because these statements were all conditionally privileged, this court recommends that the claim of defamation be dismissed.

 "Defamation is 'the publication of material by one without a privilege to do so which ridicules or treats the plaintiff with contempt.'" *Martinez v. New Eng. Med. Ctr. Hosps., Inc.*, 307 F.Supp.2d 257, 268 (D.Mass.2004) (quoting *Correllas v. Viveiros*, 410 Mass. 314, 319, 572 N.E.2d 7, 10 (1991)). "The elements of a defamation claim include (1) a false and defamatory communication (2) of and concerning the plaintiff which is (3) published or shown to a third party." *Dorn v. Astra USA*, 975 F.Supp. 388, 396 (D.Mass.1997) (citing *McAvoy v. Shufrin*, 401 Mass. 593, 597, 518 N.E.2d 513, 517 (1988)). "Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn or ridicule, or tend to impair his or her standing in the community." *Id.* (citing *Poland v. Post Publishing Co.*, 330 Mass. 701, 704, 116 N.E.2d 860, 863 (1953)).

*See also Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 42 (1st Cir.1998). Furthermore, "[p]ublication of a defamatory matter to a third person is an essential element of defamation." *Hiles v. Episcopal Diocese of Mass.*, 437 Mass. 505, 519, 773 N.E.2d 929, 940 (2002).

 Mere expressions of opinion are protected by the First Amendment and are not actionable. *See Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 130 (1st Cir.1997). "The determination whether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion." *Friedman v. Boston Broadcasters, Inc.*, 402 Mass. 376, 379, 522 N.E.2d 959, 962 (1988) (quoting *King v. Globe Newspaper Co.*, 400 Mass. 705, 709, 512 N.E.2d 241, 244 (1987)) (additional citations omitted).

Here, Acosta contends that the statements at issue are mere expressions of opinion and therefore are not actionable. (*See Acosta's Mem.* (Docket # 43) at 4–5). If the challenged statements were limited to statements such as Cornwell's behavior was "inappropriate" or "unprofessional" or "threatening," there would be merit to Acosta's position. *See, e.g., Petsch–Schmid v. Boston Edison Co.*, 914 F.Supp. 697, 705 (D.Mass.1996) (statements that employee had "behaved unprofessionally," had "threatened" another and would prob-

ably be fired, had "performance problems," and the like were statements of opinion and are not actionable); *Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d at 130 (comment that store was "trashy" constitutes "loose language that cannot be objectively verified" and thus is a statement of opinion). However, Cornwell's claim is not so limited. Rather, Cornwell objects to all the allegedly factual descriptions of his behavior which were conveyed by DeRosa and Acosta to others within Acosta and to DFA. Such statements are statements of fact and may, if the other elements of tort are satisfied, form the basis of the defamation claim. *See Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d at 130–31 (statement that at competitor's business "you are sometimes put on hold for 20 minutes—or the phone is never picked up at all" is a statement of fact not opinion).

 Nevertheless, this court concludes that the claim for defamation must fail because DeRosa's statements to her supervisor and HR personnel, and DeRosa's and other Acosta personnel's statements to DFA, were conditionally privileged, and the privilege has not been lost. "Massachusetts courts have recognized that a person may possess a conditional privilege to publish defamatory material if the publication is reasonably necessary to the protection or furtherance of a legitimate business interest." *Bratt v. Int'l Bus. Machs. Corp.*, 392 Mass. 508, 512–13, 467 N.E.2d 126, 131 (1984). Furthermore, the privilege applies "if the publisher and the recipient share a common interest and the communication is of a kind reasonably calculated to protect or further it." *Sklar v. Beth Israel Deaconess Med. Ctr.*, 59 Mass.App.Ct. 550, 558, 797 N.E.2d 381, 388 (2003) (internal quotation omitted). Thus, the privilege applies to statements about an employee's job performance and con-

duct made to the employee's supervisor, department head or others who should be informed provided "the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." *McCone v. New Eng. Tel. & Tel. Co.*, 393 Mass. 231, 235, 471 N.E.2d 47, 51 (1984) (internal quotation omitted). Similarly, "an employee of a company enjoys a qualified privilege to make disparaging comments about the performance of an employee of another company with which the first has a business relationship insofar as the comments are relevant to that relationship. Indeed, such a case may be a particularly obvious example of the common interest qualified privilege." *Humphrey v. Nat'l Semiconductor Corp.*, 18 Mass.App. Ct. 132, 133–34, 463 N.E.2d 1197, 1199 (1984). Here, DeRosa made statements about Cornwell's behavior which related to his job performance and conduct at work. On their face, these statements fall within the ambit of conditionally privileged information. Even if the information turns out not to be true it would not negate the privilege, since the statements were related to "the employer's legitimate interest in the fitness of an employee to perform his or her job." *Garrity v. John Hancock Mut. Life Ins. Co.*, No. Civ. A. 00–12143–RWZ, 2002 WL 974676, at \*4 (D.Mass. May 7, 2002) (supervisors' statements to former co-workers that employees were terminated for sending and receiving "sexually lewd, harassing [and] defamatory" and "sexually explicit" e-mails privileged communications) (quoting *Dexter's Hearthside Rest. v. Whitehall Co.*, 24 Mass.App. Ct. 217, 222, 508 N.E.2d 113, 117 (1987)).

 "The conditional privilege is lost if the defendant (1) knew the information was false, (2) had no reason to believe it to be true, or (3) recklessly published the information unnecessarily, unreasonably, or excessively." *Sklar v. Beth Israel*

*Deaconess Med. Ctr.*, 59 Mass.App.Ct. at 558, 797 N.E.2d at 388. The burden is on the employee, Cornwell, to prove that the privilege has been abused. *Humphrey v. Nat'l Semiconductor Corp.*, 18 Mass.App. Ct. at 134, 463 N.E.2d at 1199. In the instant case, Cornwell argues that some (but not all) of DeRosa's reports were false, and that to the extent there was a factual basis for the report she had misinterpreted the situation. For its part, Acosta argues that "[t]ruth is an absolute defense to a defamation action under Massachusetts law[.]" *Mass. Sch. of Law at Andover, Inc. v. Am. Bar. Ass'n*, 142 F.3d at 42. However, this court does not need to decide whether a jury would find these statements true or not. There is no evidence that DeRosa intentionally made up the allegations or did not actually believe what she saw or heard, or what she was told. See *Foley v. Polaroid Corp.*, 400 Mass. 82, 95–96, 508 N.E.2d 72, 79–80 (1987) (where there was no evidence that publisher of statement "did not believe that 'something occurred' or that his belief was not reasonably grounded," no reckless publication and statements were privileged). Similarly, there is no evidence that other Acosta personnel had reason to believe the information was not true. For example, while Acosta did not conduct a formal investigation, Tenny of HR did discuss the matter with DeRosa and two Acosta associates DeRosa had identified as witnesses. (Acosta ¶ 23).

■ There also is not enough evidence in the record to establish, as Cornwell must, that the information was published "unnecessarily, unreasonably or excessive-

ly." Clearly, there was no excessive publication. DeRosa reported to persons within Acosta who would naturally receive such information, and to Cornwell's supervisor at DFA who would normally be the one to receive the information.[19] Moreover, "for a defendant in a defamation case to lose a conditional privilege to publish defamatory material by 'unnecessary, unreasonable or excessive publication,' the plaintiff must prove that the defendant published the defamatory information recklessly." *Foley v. Polaroid Corp.*, 400 Mass. 82, 95, 508 N.E.2d 72, 79 (1987) (internal punctuation and citation omitted). Here, however, there is no evidence that any Acosta personnel acted for any reason other than Acosta's legitimate business interest.[20] Acosta did not recklessly publish false information and did not engage in excessive publication. Under such circumstances, summary judgment should enter in favor of the defendants on the claim for defamation. See *Mullen v. Ludlow Hosp. Soc.*, 32 Mass.App.Ct. 968, 970, 592 N.E.2d 1342, 1345 (1992).

### G. *Intentional Interference*

■ In Count V of his complaint, Cornwell contends that DeRosa and Acosta intentionally and tortiously interfered with his advantageous business relations with DFA. (Compl.¶¶ 68–71). "In an action for intentional interference with advantageous relations, an employee must prove that (1)[he] had an advantageous employment relationship with [his] employer; (2) the defendant knowingly induced the employer to break that relationship; (3) the defendant's interference, in

19. Cornwell contends that DeRosa, consistent with Acosta's harassment policy, should have kept the matter in-house. Irrespective of any internal policy for investigating complaints, the plaintiff has cited no policy or law which would preclude an employee from going directly to the offending person's supervisor.

20. Even assuming, *arguendo*, that Acosta reported information about Cornwell so that DFA could have sufficient incidents in his record to justify his termination, since DFA was not motivated by discriminatory animus, by assisting DFA Acosta was not acting wrongfully.

addition to being intentional, was improper in motive or means; and (4) the employee was harmed by the defendant's actions." *Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 781, 752 N.E.2d 700, 715 (2001). As detailed above, the actions of DeRosa and Acosta in reporting to DFA were privileged. To establish that they nevertheless acted with improper motive or means, Cornwell must establish that they acted "out of a spiteful, malignant purpose that has no connection to the legitimate business interests of the employer." *Petsch–Schmid v. Boston Edison Co.*, 914 F.Supp. at 706. *Accord Sklar v. Beth Israel Deaconess Med. Ctr.*, 59 Mass.App.Ct. at 554, 797 N.E.2d at 385. There is no such evidence in the instant case. Consequently, this court recommends that the motion for summary judgment as to Count V of the complaint be allowed.

## IV. *CONCLUSION*

For the reasons stated herein, this court recommends to the District Judge to whom this case is assigned that both DFA's Motion for Summary Judgment (Docket # 36) and Acosta and DeRosa's Motion for Summary Judgment (Docket # 41) be ALLOWED.[21]

---

**21.** The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*

*Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete*, 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn*, 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 (1st Cir. 1998).